IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 26, 2000 Session

## STATE OF TENNESSEE v. ALLEN BOWERS, JR.

**Direct Appeal from the Circuit Court for Bledsoe County**
**No. 10616      Thomas W. Graham, Judge**

_____

**No. E1999-00882-CCA-R3-CD**
**August 30, 2001**
_____

A Bledsoe County jury convicted the Defendant of rape of a child, and the trial court sentenced the Defendant to eighteen years in the Tennessee Department of Correction.  The Defendant now appeals, arguing (1) that his conviction should be reversed because a prospective juror for this case stated in the presence of other prospective jurors that he had been a prospective juror in a previous criminal case in which the Defendant was on trial; (2) that the trial court erred by not ordering a new trial for the Defendant based on a letter that the Defendant's mother received from the victim subsequent to the Defendant's trial in which the victim stated that "nothing happened" between the Defendant and the victim; (3) that the trial court erred by not granting the Defendant a new trial based on evidence presented during the hearing on the Defendant's motion for new trial that a document introduced into evidence at trial as a filed divorce complaint had actually not been filed and contained prejudicial and improper statements about the Defendant; (4) that the State, during its closing argument, improperly mentioned facts not in the record; (5) that the trial court erroneously instructed the jury concerning a "deadlock" in a supplemental instruction; and (6) that the trial court erred by giving the jury the dictionary definition of "captious" and by sending the definition in writing to the jury room without reading it to the jury.  After a thorough review of the record, we find no reversible error and therefore affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

David L. Raybin (on appeal), Nashville, Tennessee; and Leonard M. Caputo (at trial), Chattanooga, Tennessee, for the Appellant, Allen Bowers, Jr.

Paul G. Summers, Attorney General and Reporter; R. Stephen Jobe, Assistant Attorney General; J. Michael Taylor, District Attorney General; and James W. Pope, III, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

## I. <u>PROCEDURAL HISTORY</u>

The Defendant, Allen Bowers, Jr., was indicted in November 1995 by the Bledsoe County Grand Jury for one count of rape of a child. In February 1997, after a three-day trial, a Bledsoe County jury convicted the Defendant of the indicted charge. The Defendant was convicted of rape of a child for engaging in sexual intercourse with A.S.,[1] who was an eleven-year-old girl at the time of the offense. Rape of a child is defined as the unlawful sexual penetration of a victim by the defendant or of the defendant by a victim, if such victim is less than thirteen years of age. Tenn. Code Ann. § 39-13-522. The indictment alleges that the Defendant sexually penetrated A.S., with this act allegedly occurring between October 31, 1994 and November 24, 1994. Following a sentencing hearing in April 1997, the trial court sentenced the Defendant to twenty-one years in the Tennessee Department of Correction. This sentence was modified by the trial court in August 1997 to a sentence of eighteen years in the Tennessee Department of Correction.

In July 1999, the trial court conducted a hearing on the Defendant's motion for a new trial, at which several witnesses testified, including the victim. The primary focus of the testimonial evidence at the hearing on the motion for new trial was the Defendant's allegation that he should be granted a new trial because subsequent to the trial, his mother received a letter from the victim in which the victim stated that "nothing happened" between the Defendant and the victim. The trial court took the motion for new trial under advisement and subsequently entered an order on July 19, 1999 denying the motion for new trial.

## II. <u>FACTS</u>

At trial, the State presented the testimony of three witnesses. These witnesses were the victim, A.S.; Jennifer Newby (formerly Bowers), the estranged wife of the Defendant; and James Newby, Jennifer Newby's father.

A.S. testified that when the offense occurred, she was an eleven-year-old sixth-grade student. At the time, her mother's friend, Sharon, was dating the Defendant. A.S. testified that she once spent the night with the Defendant, the Defendant's girlfriend and the Defendant's three-year-old daughter by a previous marriage. A.S. put the infant daughter to bed for the evening and began watching television on the living room couch. She testified that the Defendant came into the living room, turned on the radio, and began slow-dancing with her. The Defendant was wearing only a pair of shorts, and A.S. noticed that he had an erection as they danced. The Defendant undressed A.S. and engaged in sexual intercourse with her on a blanket on the floor.

---

[1] It is the policy of this Court to refer to minor victims in cases of sexual abuse by initials rather than by name.

Although A.S. initially told no one about the incident with the Defendant, she eventually told a school friend, who then told a teacher, who in turn told a Tennessee Bureau of Investigation (T.B.I.) agent. The T.B.I. agent proposed that A.S. telephone the Defendant and record their conversations, during which A.S. would attempt to obtain an admission from the Defendant regarding his sexual activity with A.S.

Three recordings of conversations between A.S. and the Defendant were introduced as evidence at trial and played for the jury. The first recording occurred in February 1995, and although no specific admission was made by the Defendant during the conversation, the jury heard the Defendant's tone of voice and concern that "the law" could be listening. Two more taped conversations occurred in August 1995, during which the Defendant discussed explicit sexual matters with A.S. Both of the conversations that were taped in August contained statements by the Defendant that could reasonably be construed by a jury to be admissions that he had engaged in sexual intercourse with A.S. at some prior time.

The next witness for the State was Jennifer Newby, the estranged wife of the Defendant. The majority of Jennifer Newby's testimony pertained to two recorded conversations that Jennifer Newby had with the victim, A.S. In the first of these conversations, which occurred in March 1996, A.S. denied that the Defendant had raped her. In the second conversation, which occurred in August 1996, A.S. confirmed that she had had no "sexual contact" with the Defendant. Both conversations were recorded near A.S.'s school, because of Jennifer Newby's concern that any contact between Jennifer Newby and A.S. would be met with disapproval by A.S.'s mother. The tape recordings of both of these conversations were admitted into evidence, and the jury listened to them during the trial.

Jennifer Newby and A.S. both testified that the conversations recorded in March and August of 1996 were staged and that A.S. did not tell the truth during either of the two conversations. Jennifer Newby and A.S. testified that they discussed what A.S. should say before the taping began, and A.S. testified that she cooperated in these two taped conversations because she was afraid of the Defendant. Jennifer Newby also testified that she assisted in these staged tape-recorded conversations because she was afraid of the Defendant.

At trial, Jennifer Newby testified that she was nineteen years old, pregnant and unemployed. She testified that she had filed for a divorce from the Defendant in September 1996 but that they later reconciled. However, she testified that she filed for divorce again on December 2, 1996. The Defendant filed a complaint for divorce against Jennifer Newby on December 27, 1996, in which he disputed the paternity of Jennifer Newby's unborn child. Jennifer Newby testified that she had told the Defendant she was going to play "hard ball" upon learning that the Defendant disputed paternity of her unborn child.

The final witness for the State was James Newby, Jennifer's father. Newby testified that he had heard the Defendant admit to and brag about having sex with A.S. He also stated that the

Defendant claimed he would never be caught because he was smarter than the law enforcement authorities.

Additional evidence was presented as part of the State's case in the form of a stipulation that A.S. was examined by a doctor on February 17, 1995, approximately three months after the offense. At the time of the examination, A.S. was eleven years old. The doctor who examined A.S. determined that A.S.'s hymen was not intact.

The defense proof consisted of testimony by the Defendant and four witnesses. The Defendant's friend, Greg Buckner, testified that he was present with the Defendant when each of the three recorded conversations between the Defendant and A.S. occurred. Buckner confirmed that the Defendant was abusing drugs and would become hyperactive and vulgar when under the influence of "crank." Buckner believed that the Defendant was clowning around and playing to a crowd of people who were also present when he was having the three recorded conversations with the victim. The other three defense witnesses, Randy Deakins, Delanie Deakins and Wanda Deakins, were acquaintances of Jennifer Newby. They all testified to the effect that Jennifer Newby was excited and happy to have obtained the tape-recorded conversations of A.S. in which A.S. purportedly denied that the rape or sexual contact had occurred.

The Defendant testified that he had never engaged in sexual intercourse or sexual relations with A.S. He testified that he did not meet A.S. until just before Christmas 1994, after the time frame in which the alleged rape happened. According to the Defendant, he was high on "crank" during the tape-recorded conversations with A.S. He testified that being under the influence of "crank" made him hyperactive and more likely to use the type of vulgar language that is heard on the tape recordings. He stated that other individuals were present during these conversations listening to his end of the conversation, and he maintained that much of the time he was simply putting on a show for these individuals. He also testified that he believed that the conversations were in fact being recorded.

In July 1999, the trial court conducted a hearing on the Defendant's motion for new trial, at which several witnesses testified. Along with other grounds, the Defendant alleged that his mother, Barbara Bowers, had received a letter from A.S. stating that "nothing happened" between the Defendant and A.S. Barbara Bowers testified at the hearing on the Defendant's motion for a new trial that on August 23, 1997, she received a letter stating the following:

Barbara

What's up? Look sorry for What happened with your son. I didn't mean to Hurt you in that way. Whenever it was time for court things got all out of hand. Nothing happened between us. I just want all of this to be over. I don't know why I desided [sic] to write you this letter. I guess I just wanted to let you know nothing happened. Thengs [sic] just went a little further than we all expected.

♡

[A.S.]

Although Barbara Bowers testified that she had nothing to do with procuring the letter, she did admit that she had telephoned the mother of A.S. about the case, asking the mother of A.S. to persuade A.S. to "tell the truth." A.S. and Jennifer Newby both testified at the hearing on the motion for new trial that the letter was not true insofar as it stated that nothing had happened between the Defendant and the victim. A.S. testified that Jennifer Newby had asked her to write the letter because Barbara Bowers was pressuring Jennifer Newby. A.S. again testified that her testimony at trial had been true.

Jennifer Newby testified that she had asked A.S. to write the letter, but that it was Barbara Bowers' idea and that Barbara Bowers had pressured her to persuade A.S. to write the letter. Jennifer Newby also admitted that she had given a taped statement to the Defendant's attorney in which she indicated that her testimony at trial had been false. However, she testified at the hearing on the motion for new trial that her trial testimony was in fact true. She explained that after giving the statement to defense counsel that her trial testimony had been false, Barbara Bowers assisted her in purchasing a used car.

Concerning an additional issue in this case, Jennifer Newby testified at the motion for new trial hearing that she had met with her attorney and understood that her divorce complaint was to be filed on December 2, 1996. The evidence at the motion for new trial hearing clearly indicated that Jennifer Newby's divorce complaint was in fact not filed on December 2, 1996, as represented to the jury when it was introduced as evidence during the Defendant's trial.

## III.  ANALYSIS

### A.  Jury Selection

On the morning of trial, the trial court began a general voir dire of twenty-eight prospective jurors. The trial court began with a comprehensive explanation to the prospective jurors regarding the duties and responsibilities of each juror. The trial court then excused several jurors for cause. A prospective juror, Carlton Cooley, stated that his wife was in Nashville at Vanderbilt University taking classes and that he had three small children and nobody with whom to leave his children. The trial court indicated that Mr. Cooley would be placed on a "stand-by list" whereby Mr. Cooley would only be considered for service if a lack of a sufficient number of jurors required it. Thereafter, the following occurred:

**THE COURT**: What's your name again sir?
**MR. COOLEY**: Carlton Cooley.  I was a juror once before when Mr. Bounds was being tried once before.
**THE COURT**: Mr. Bowers you mean?
**MR. COOLEY**: Yes, whatever.
**THE COURT**: You were on that case?
**MR. COOLEY**: Pardon?
**THE COURT**: You were on a case where he was . . .
**MR. COOLEY**: I was a juror, I was turned loose.

**THE COURT**: Okay.
**MR. COOLEY**: They didn't keep me once before.
**THE COURT**: Okay.

Thereafter, the trial court and the attorneys for both sides had an extensive discussion out of the hearing of the jury as to how to effectively deal with Mr. Cooley's statement that he "was a juror once before when Mr. Bounds was being tried once before." The trial court was informed (apparently for the first time) that the Defendant had been previously tried in Bledsoe County for another alleged rape and acquitted by the jury. Nothing else was said at that time to the prospective jurors concerning Mr. Cooley's comment, and the court concluded its portion of the voir dire. Thereafter, each attorney conducted a thorough voir dire. At the conclusion of defense counsel's voir dire, defense counsel made the following statement:

> Now one of the jurors, I can't - - the way we're doing this today I'm having trouble keeping track of everybody, let me see what we've got. We've got these pages like this. One of the jurors mentioned a previous trial where he was sitting as an alternate juror or sitting as a juror, but never got to sit during the proof. I will state to you that in that particular case Mr. Bowers was not guilty. Normally, that's something that you all don't even know about. But the fact that that came out in the courtroom and of course, none of us know what that was about. The fact that he was found not guilty, but the fact that he has been in court before, four or five years ago for something, does that cause any of you any problem? Can all of you judge this case based just by what you see and hear in this courtroom today? Any reason why any one of you in either location feels that he or she could not be a fair and impartial juror? Thank you.

A jury was ultimately selected, and it did not include Mr. Cooley. The trial court then gave the jury a thorough explanation of its duties and responsibilities, and the trial began.

The Defendant argues that the trial court should have declared a mistrial because the pool of prospective jurors from which the jury was chosen for this case was informed that the Defendant had previously been tried by a jury for some unknown criminal offense and been found not guilty. The information that the Defendant had previously been tried by a jury was revealed to the pool of jurors in this case by a member of that pool, Mr. Cooley. In an effort to deal with this disclosure, the Defendant's attorney, with the permission of the trial court, informed the pool of jurors that the Defendant was found not guilty at the previous trial.

In arguing that the trial court should have declared a mistrial due to Cooley's comments, the Defendant relies on State v. Scruggs, 589 S.W.2d 899 (Tenn. 1999), in which our supreme court reversed a conviction because the jury was made aware by a prospective juror that the prospective juror had at one time been Scrugg's probation officer. Id. at 901. The State argues that the instant case is clearly distinguishable from Scruggs. First, the jury here was not charged with determining punishment, which was a key factor in the Scruggs decision. Second, the jury here knew that the Defendant had been previously tried and found not guilty, rather than knowing that the defendant

-6-

was tried and found guilty, as did the jury in Scruggs. Third, the jury was faced only with a single comment and no specific details, as opposed to multiple comments in Scruggs. We conclude that these distinguishing factors do differentiate this case from Scruggs.

The State correctly points out that before the presentation of proof began, the trial court admonished the jury not to allow extraneous facts to influence their decision in this case. It is well settled that a jury is presumed to follow the trial court's instructions. State v. Blackmon, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985); State v. Compton, 642 S.W.2d 745, 746 (Tenn. Crim. App. 1982). The record also reveals a thorough voir dire by the attorneys for each side, during which any prospective juror who felt that he or she might have been influenced by Cooley's remarks had ample opportunity to say so.

Additionally, the State argues that the Defendant's concern over the jurors knowing that he had previously been charged with a crime is "fleeting," given the proof during the trial of criminal behavior by the Defendant in the form of narcotics usage. The State's attorney at trial stated that the prior trial for rape, the very crime for which the Defendant was convicted in this case, was "highly publicized" and that it would be "tough" to deal with this because "it was a high - - it was in the papers and everything, local paper and it's a very small town, - - and that's not the only thing [for which] he's been in court before - - -."[2]

The procedure relating to the selection of a fair and impartial jury is a matter entrusted to the sound discretion of the trial court. State v. Plummer, 658 S.W.2d 141, 143 (Tenn. Crim. App. 1983); Tenn. R. Crim. P. 24(a). A trial court is granted wide discretion in ruling on the qualifications of the jurors, and a trial court's decision in this regard will not be overturned absent an abuse of discretion. State v. Kilburn, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989). When an issue arises concerning a prospective juror's exposure to information that may be inadmissible at trial, Tennessee Rules of Criminal Procedure Rule 24(b)(2) contemplates a determination by the trial court as to whether the information is so prejudicial as to create a substantial risk that the juror's judgment will be affected by the exposure to the information. If not, and the prospective jurors indicate, as in this case, that they will be impartial, then the acceptability of the prospective jury shall depend on whether the trial court believes the jurors' testimony that they are impartial. From our review, we conclude in this case that the information imparted to the other prospective jurors by prospective juror Cooley was not so prejudicial as to create a "substantial risk" that their judgment would be affected and that the trial court determined that the jurors' testimony as to their impartiality was believable. Thus, we conclude that this issue is without merit.

---

[2]In fairness to the State, the "this" to which the State's attorney refers could very well be the difficulty generally of finding jurors who were totally without any knowledge of the Defendant's "highly publicized" previous trial and general reputation, rather than the specific issue of Cooley's comments.

## B. **Recantation by the Victim**

The Defendant insists that the trial court erred in failing to order a new trial based on the victim's letter to the Defendant's mother stating that nothing had happened between her and the Defendant. Evidence of a post-trial recantation by a victim is similar to newly discovered evidence regarding whether or not a new trial is required. A new trial on the basis of newly discovered evidence should be granted in cases where (1) the defendant has been reasonably diligent in obtaining evidence, (2) the materiality of the new evidence is apparent, and (3) the evidence is likely to change the result of the trial. State v. Singleton, 853 S.W.2d 490, 496 (Tenn. 1993). In order to be entitled to a new trial based on newly discovered evidence, a defendant must demonstrate that all three prongs of the test have been met. See State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994). The decision to grant or deny a new trial on the basis of newly discovered evidence rests within the sound discretion of the trial judge. State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997). Accordingly, our standard of review is abuse of discretion. See State v. Mead, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996).

As the defense points out in its brief, the trial judge assessed the credibility of the witnesses who testified at the hearing on the Defendant's motion for new trial. We agree with the Defendant's assertion that the trial judge discounted testimony by the Defendant's mother that she had nothing to do with the letter of recantation. We respectfully disagree with the Defendant's assertion in his brief that "once the defense established beyond any doubt that [A.S.] had written the letter, questions of credibility are to be considered by another jury and not the trial judge." An assessment of the witnesses' credibility by the trial court is essential in order for the trial court to determine whether the evidence is likely to change the result of the trial. "The trial court may determine the credibility of any newly discovered evidence, and if the court concludes that the evidence would not be worthy of belief by the jury, the court should deny the motion for new trial." State v. Marlon D. Beauregard, No. W1999-01496-CCA-R3-CD, 2000 WL 705978, at *4 (Tenn. Crim. App., Jackson, May 26, 2000) (citing Evans v. State, 557 S.W.2d 927, 938 (Tenn. Crim. App. 1977)). Additionally, it is a well-settled rule that newly discovered impeachment evidence will not constitute persuasive grounds for a new trial unless the impeachment evidence is so crucial to the issue of the Defendant's guilt or innocence that the admission of the newly discovered impeachment evidence will probably result in an acquittal. See Singleton, 853 S.W.2d at 496; State v. Rogers, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985).

We agree with the State's assertion in its brief that "the new evidence essentially mimics evidence which was presented at trial." The jury heard evidence that the victim recanted her testimony before trial in two tape-recorded conversations between the victim and Jennifer Newby. In addition, the jury heard evidence that Jennifer Newby acted as if the tapes were authentic. However, the jury also heard the testimony of both A.S. and Jennifer Newby that those tape recordings were staged falsehoods. The jury had ample opportunity to assess the credibility of these witnesses and give their testimony the weight that the jury deemed appropriate.

The Defendant points out that the evidence of A.S.'s most recent alleged recantation is particularly crucial because of the "closeness" of the case. Although the only possible eyewitnesses to the rape were A.S. and the Defendant, there is other evidence that supports the jury's verdict. The recorded conversations between the Defendant and A.S. reveal statements by the Defendant from which the jury could logically infer that sexual activity had occurred between the Defendant and the victim. A witness testified that the Defendant had, in fact, bragged about having sex with A.S. and that the Defendant stated that he would not be caught because he was smarter than the authorities. The Defendant urges this Court to review this case "under the standard by which we would inquire as to whether the new evidence would create a reasonable doubt in the mind of a jury." We respectfully decline to adopt that standard. We conclude that the appropriate standard for determining whether non-impeaching new evidence mandates a new trial is whether the evidence is likely to change the result of the trial. See Singleton, 853 S.W.2d at 496. In the case of impeaching evidence, as is the case here, we conclude that the appropriate test is whether the evidence is "so crucial to the Defendant's guilt or innocence that its admission will probably result in an acquittal." Id. The trial court ruled against the Defendant on this issue, and we cannot find that the trial court abused its discretion. Accordingly, this issue is without merit.

## C. Evidence Pertaining to Divorce Complaint

At trial, Jennifer Newby testified that she filed for divorce against the Defendant on December 2, 1996. With the understanding that a certified copy of the divorce complaint would be substituted later, the trial court allowed a xerox copy of the divorce complaint to be introduced into evidence as an exhibit. Subsequently, at the hearing on the Defendant's motion for new trial, Jennifer Newby testified that she had met with her attorney, and it was her understanding that the divorce complaint had been filed on December 2, 1996. However, based on the evidence presented at the hearing on the Defendant's motion for new trial, it is clear that the divorce complaint was never filed.

The Defendant argues on appeal that it was prejudicial to the Defendant for the State to introduce a document which was in fact never filed anywhere as a "real" divorce complaint. The Defendant further argues that the document contained allegations of physical violence committed by the Defendant against his former wife, which should not have been put before the jury in this manner. The Defendant also argues that the State "reinforced" Jennifer Newby's credibility with a document which was "a fraud." Although the Defendant does not suggest that the Assistant District Attorney or the trial court was aware of this alleged "fraud," the Defendant argues that the witness was aware of it.

The State points out that the importance of the date that Jennifer Newby filed for divorce against the Defendant relates to the Defendant's theory that she was lying about staging the recorded conversations with the victim because she wanted revenge for the Defendant's filing for divorce and disputing paternity of their child. Evidence was introduced at trial showing that the Defendant had filed for divorce against his wife on December 27, 1996 and that the Defendant had disputed paternity of the then-unborn child of the marriage. Jennifer Newby admitted having told the

Defendant, after he accused her of becoming pregnant by another man, that she was "going to play hardball" and "it's coming right at you." By proving that Jennifer Newby had already filed for a divorce from the Defendant prior to the Defendant's disputing paternity of the child in his own divorce complaint, the State was attempting to prove that she had become "fed up" with the Defendant before he ever filed for divorce.

We agree with the State that this issue, like the previous recantation issue, is best analyzed using principles of law pertaining to newly discovered evidence. The newly discovered evidence is the fact that the divorce complaint in question was not filed on December 2, 1996. In applying the Singleton analysis, see id., we conclude that the Defendant was reasonably diligent in obtaining the new evidence and that the new evidence is relevant. However, we conclude that the new evidence is unlikely to change the result of the trial. Although the divorce complaint was not actually filed, the evidence is clear that it was signed and notarized on December 2, 1996. It is, therefore, clear that the written allegations in the document were made by Jennifer Newby prior to the allegations made by the Defendant in his complaint for divorce. Therefore, it would be reasonable for the jury to conclude, as the State contended, that Jennifer Newby was "fed up" with the Defendant on or before December 2, 1996, twenty-five days before the Defendant filed a divorce complaint against her disputing paternity of their then-unborn child.

At trial, the Defendant objected to the admission of the December 2, 1996 document that contained allegations of physical violence by the Defendant against his former wife. However, the Defendant then withdrew the objection. Other testimony alleging physical violence by the Defendant against his former wife was admitted without objection by the Defendant.

The trial court in its discretion determined that the fact that Jennifer Newby's divorce complaint had not been filed on December 2, 1996, as she testified, was not a sufficient reason to order a new trial. Again, we cannot conclude that the trial court abused its discretion in this regard.

### D. Closing Argument at Trial

During a portion of the State's closing argument, Assistant District Attorney General Pope made the following statements:

> [Defense counsel] wants to harp on Larry Burkes. And I admit to you, ladies and gentlemen, we have to give all of our proof, all our transcripts, everything, our witness list to the defense beforehand. If we know of any exculpatory evidence we have to give them that and I told them up front, A.S. told her when this first came out and she was connected with David Emiren, through Diana Byrd, Grace Seals and David Emiren didn't come into this. She didn't go to David Emiren, T.B.I. She told this to a friend at school and there's no question, A.S. had feelings for the man and that's how this came out. She was telling a friend about it at school, who told Diana Byrd, . . . and Diana Byrd put her in touch [with] Grace Seals, the youth service officer here, when they called the TBI, David Emiren, who lives here in this county. That's how this came about, ladies and gentlemen. You heard that proof. But ole

[sic] Larry Burkes and here you have David Emiren come in to investigate this case, ladies and gentlemen, and you've got a mother who by Mr. Bowers['] own admission, he had been doing drugs with, swapping dope around, him and Michelle and Sharon, this man doesn't know if her mother is going to protect her, so he tells you, don't tell your mother, don't tell your father.

Following these comments by the State, counsel for the defense objected, stating, "That's not in the record. He's testify[ing] to that."

The State argued that T.B.I. Agent David Emiren had told A.S. not to tell her parents that she had engaged in sexual intercourse with the Defendant. Emiren did not testify during the trial. There is no evidence in this record that Emiren instructed the victim to refrain from telling her parents about her relationship with the Defendant. The State concedes in its brief that the prosecutor's argument in this regard was not supported by facts in the record. However, the State contends that the erroneous argument was harmless error, because the jury was instructed that argument of counsel was not to be considered as evidence. Tennessee Courts have repeatedly held that jurors are presumed to follow the instructions of the trial court. See Compton, at 746. The State contends that the improper argument cannot be said to have affirmatively affected the result of the trial and that accordingly, any error in this regard was harmless. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

Lawyers are prohibited from arguing facts which are outside the record. State v. Beasley, 536 S.W.2d 328, 330 (Tenn. 1976). Where argument is improper, the established test for determining whether there is reversible error is whether the improper conduct "affected the verdict to the prejudice of the Defendant." Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); State v. Bigbee, 885 S.W.2d 797, 800 (Tenn. 1994). In determining whether the improper argument prejudiced the Defendant, we must consider: (1) the conduct complained of, viewed in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper argument; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case. State v. Middlebrooks, 995 S.W.2d 550, 560 (Tenn. 1999).

In applying these factors to the improper argument in this case, we do not view the conduct complained of as an especially egregious situation when viewed in light of the facts and circumstances of the case. During argument at the hearing on the motion for new trial, the prosecutor explained his intent in making the argument. He alleged that his argument was basically a response to what he believed were defense counsel's inappropriate comments about the State's failure to call two witnesses, one of whom was T.B.I. Agent Emiren. Although the court gave no curative instructions to the jury at the time the improper argument was made, the court did give standard instructions to the effect that what the attorneys say during a trial is not evidence. With regard to the relative strength and weakness of the case, it is our view that the State presented sufficient evidence to support the conviction. Even considered with other errors that may have occurred at the trial, the cumulative effect of the improper argument with other errors is not

-11-

sufficient to justify a reversal of the Defendant's conviction. We conclude that the improper argument did not affect the verdict to the prejudice of the Defendant.

## E. **Supplemental "Deadlock" Jury Instruction**

The jury deliberated approximately ten hours over the course of two days and found the Defendant guilty of the indicted offense. The record indicates that the jury deliberated from approximately 6:32 p.m. until approximately 10:26 p.m. on the first day of their deliberations. Prior to the jury resuming deliberations the next morning at approximately 9:00 a.m., the court, over the Defendant's objection, instructed the jury as follows:

> Ladies and gentlemen, I just wanted to, there is a portion of the charge that we are allowed to re-state to you. We don't go back and re-read charges to you except on the issue of deliberation, and I did think it might be of some benefit just to re-state the deliberations sections. It is in your written charge which will be sent back with you again as you begin deliberations again. But just to kind of consider the process, I'm going to re-state this to you.
>
> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide this case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and to change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or the effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.
>
> Having stated that I'm going to send all the same things back with you. You'll have the written charge, the verdict form, and the exhibits that we were able to send back to you, and of course, as we have previously indicated to you, if you wish to listen to the tapes which are exhibits also then let us know, and we'll bring you back in like we did yesterday for the purpose.
>
> All right, let's all rise and allow the jury to go back to working on their job.

The previous evening, the trial court had referred to the above instruction as "the dynamite charge which is just part of your regular charge about the responsibilities and so forth . . . ."

Although the jury had not reported that they were unable to reach a verdict, we find no error on the part of the trial court in instructing them as stated above. The instruction given by the trial court is clearly not a "dynamite" or <u>Allen</u> charge. <u>See</u> <u>Allen v. United States</u>, 164 U.S. 492, 501 (1896). In <u>State v. Kersey</u>, 525 S.W.2d 139 (Tenn. 1975), our supreme court ruled that the "dynamite" charge is an impermissible, judicially mandated majority verdict and concluded that the only proper inquiring of the jury "as to its progress [is to ask the jury] . . . whether it believes it might reach a verdict after further deliberations." <u>Id.</u> at 141. The instruction given by the trial court was a correct statement of law. As the State points out in its brief, the supplemental instruction certainly did not cause the jury to suddenly agree upon a verdict, because the jury deliberated for six more hours following the supplemental instruction. This issue is without merit.

## F. Supplemental Jury Instruction Concerning Definition of "Captious"

During the second day of deliberations, the jury sent a note to the court requesting a dictionary and apparently requesting a definition of the word "captious." The record indicates that the following occurred in response to this request:

**THE COURT**: The way it is in here. Captious means just nothing rather, but anyway that - - they've circled that and they want to know what that means. Boy, they're getting down to it. There are several alternatives here.

**MR. CAPUTO** [Defense Counsel]: Stupid doubt.

**MALE VOICE**: Stupid doubt?

**THE COURT**: Well, it's followed by possible or imaginary, you know. Well, let's see if we can get a dictionary.

**GENERAL POPE**: Well, that's just a whim or a . . . .

**MR. CAPUTO**: Yeah.

**THE COURT**: Well, I don't know that we ought to just to decide what we please.

**THE COURT**: Just for the record the jury has sent out a note whereby they were asking for a dictionary or a definition and they also sent out with, they didn't write on that slip the word that they wanted the definition of, they sent out the written charge which the jury has been handed, and they indicated the word on that they wanted the definition for, that word is captious as contained in the definition of reasonable doubt. C-A-P-T-I-O-U-S. We went [to] Webster's Dictionary, not finding that in Black's Dictionary, went to Webster's Dictionary of Common Usage and so forth and the two listed definitions there both of which I think we agree could be sent to the jury for their enlightenment are as follows: Captious - 1. Marked by an often ill-natured inclination to stress faults and raise objections. Second definition. Calculated to confuse, entrap, or entangle in argument. So that's the definition that's going to be sent back to the jury.

**MR. CAPUTO**: Your Honor, just for the record I - - that is the correct definition. I would prefer instruction that just says look to the balance of the charge, and would object to any further definition.

**THE COURT**: They have been told that, in fact there is two, two definitions in this charge that was read to them and that they have on reasonable doubt, but at any rate - - -

**MR. CAPUTO**: (Interposing) Well, that's what I was thinking - - -

**THE COURT**: (Interposing) One contains captious and the other doesn't refer to it.

**MR. CAPUTO**: No, what I'm saying Your Honor, I would object to the definition being sent to them and request the Court to instruct them that they can look to the balance of the charge with regard to reasonable doubt or do advise them that they've been charged sufficiently on reasonable doubt. I realize the Court's going to sent [sic] that definition in - - -

**THE COURT**: (Interposing) Yes, right.

**MR. CAPUTO**: Because you've already written it out, but - - -

**THE COURT**: (Interposing) Well, for the record I'm overruling the objection, and it's been the Court's practice to provide definitions to juries when they [are] struggling over the definition of a word and generally though we do get an agreement if a definition's going at all it's got to be acceptable to both sides, or that there's . . . no objection to the content of the definition, you just don't like the definition being sent back period, right?

**MR. CAPUTO**: Well, I don't think - - no, I don't think the first part of the definition applies. I think the first, of course, that obviously wasn't from Black's because it wasn't in Black's. I think the first definition - - the first part of that definition could be very misleading to a jury. I think the first part of the definition is inconsistent with the balance of the charge on reasonable doubt.

**THE COURT**: It's helpful for the defense. It requires whoever is making this objection to have an ill-nature.

**MR. CAPUTO**: No, sir, I - - -

**THE COURT**: (Interposing) That would be helpful for you, wouldn't it?

**MR. CAPUTO**: No, sir, I think what's going on in the jury room I think from that question is that apparently in my own opinion, apparently there is probably a minority that have a reasonable doubt, and you've got the majority saying, well, we think your reasonable doubt is as follows, and they're objecting to their reasonable doubt and this suggest [sic] that for this person to have a reasonable doubt that they would have to have some type of ill-will or malice or something improper about them having a reasonable doubt and I think that - - -

**THE COURT**: (Interposing) Well, if they read though if they believe these people that have the doubts are not ill-willed then it's not a captious, at least as to the first paragraph, or the first alternative def - - which I - - that I say would be helpful to you.

**MR. CAPUTO**: Well, it could be, but I'm just saying I think it - - I think it waters down the next paragraph of your reasonable doubt charge. So I'm just voicing my objection for the record.

**THE COURT**: It's there. Okay. Let's send this back and hope they read.

The Defendant argues that the trial court committed prejudicial error by giving the jury a written note containing a dictionary definition of "captious"[3] and by failing to read the note to the entire jury in open court. The Defendant also argues that the trial court erred by failing to instruct the jury to place no undue emphasis on the supplemental instruction.

It is well settled that a trial court may provide supplemental instructions in response to jury questions. State v. Forbes, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995). It is appropriate for the jury to be provided with dictionary definitions of words or terms not in common use and not understood by persons of reasonable intelligence. See State v. Maria Maclin, No. 02C01-9710-CR-00383, 1998 WL 517839, at *2-3 (Tenn. Crim. App., Jackson, Aug. 21, 1998).

---

[3]The court's instructions state in part that a reasonable doubt does not include a "captious" doubt.

At trial, the Defendant objected to the trial court instructing the jury as to the dictionary definition of captious, and as grounds for the objection, urged the trial court to simply instruct the jury to look to the remainder of the charge to resolve their question. On appeal, the Defendant argues that the trial court erred by failing to admonish the jury not to place undue emphasis on the supplemental instruction and by failing to read the supplemental instruction to the jury in open court. It is well established that an appellant may not generally change theories from the trial court to the appellate court. State v. Harris, 839 S.W.2d 54, 65-66 (Tenn. 1992).

However, having found no merit to the Defendant's theory for objecting at trial, we will consider his additional theories at the appellate level. First, the Defendant is correct in arguing that where supplemental instructions are given, the better practice is to admonish the jury not to place undue emphasis on the supplemental instructions. Leach v. State, 552 S.W.2d 407, 408 (Tenn. Crim. App. 1977). It is also true, as the State points out in its brief, that the issue of whether the failure to do so amounts to reversible error depends upon whether the omission might reasonably be expected to prejudice the Defendant in light of the entire record. Id. (citing Burton v. State, 394 S.W.2d 873 (Tenn. 1965)). It is important to note that the jury deliberated nearly three hours after receiving the supplemental instruction. In Leach, it was obvious that the supplemental instruction triggered an immediate verdict. See id. at 409.

Secondly, the Defendant correctly points out that the trial court violated Rule 30 of the Tennessee Rules of Criminal Procedure, which provides that jury instructions shall be reduced to writing for the jury to have during deliberations and that the "written charge shall be read to the jury as it shall be taken to the jury room by the jury when it retires to consider its verdict." Tenn. R. Crim. P. 30(c) (emphasis added). The Defendant correctly points out in his brief that "there is nothing read to the jury here, just this note. This would not be much of a problem if it related to some other minor question, but the 'instruction' went to the definition of reasonable doubt which is the most fundamental instruction given to a jury."

In our view, an additional problem with the procedure used by the trial court is that there is no assurance from the record that all of the jurors received the information in the supplemental instruction. Clearly, the appropriate course of action for the trial court would have been to bring the jurors back into open court, read the supplemental instruction containing the definition of "captious," along with a supplemental instruction emphasizing that the jury should not place undue emphasis on the supplemental instructions, and then allow the jury to resume its deliberations. However, we cannot conclude that the error by the trial court more probably than not affected the judgment in light of the entire record. We therefore conclude that this error by the trial court was harmless error. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

Accordingly, we AFFIRM the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE