# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 1, 2014

## STATE OF TENNESSEE v. WENDELL GUINN

**Appeal from the Criminal Court for Shelby County**
**No. 12-05110      J. Robert Carter, Jr., Judge**

**No. W2013-01436-CCA-R3-CD  - Filed July 15, 2014**

The Defendant, Wendell Guinn, was indicted for aggravated kidnapping, a Class B felony; rape, a Class B felony; aggravated burglary, a Class C felony; and domestic assault, a Class A misdemeanor. See Tenn. Code Ann. §§ 39-13-111, -13-304, -13-503, -14-403. The State ultimately dismissed the domestic assault charge, and, following a jury trial, the Defendant was acquitted of the aggravated kidnapping and aggravated burglary charges. The jury convicted the Defendant of rape as charged in the indictment. The trial court imposed a sentence of nine years, with two years to be served in confinement and the remainder on probation. On appeal, the Defendant contends (1) that the evidence was insufficient to sustain his conviction; (2) that the trial court improperly admitted hearsay evidence; and (3) that the trial court erred in providing a supplemental instruction to the jury in response to a question from the jury during deliberations. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Lauren M. Fuchs (at trial); William D. Massey (at trial); Lorna Sullivan McClusky (at trial); and Joseph Andrew McClusky (on appeal), Memphis, Tennessee, for the appellant, Wendell Guinn.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; Hamilton Douglas Carriker and Karen Cook, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

Officer Namika Johnson of the Memphis Police Department (MPD) testified that she responded to a 911 call from the victim's house on March 19, 2012. Officer Johnson testified that when she got to the house, she found a "young lady" who said that "her grandmother was locked in a room with [the grandmother's] boyfriend and [had] yelled at her to call the police." Officer Johnson found the victim's bedroom door locked. Officer Johnson testified that she and another officer knocked on the door twice and that no one responded. Officer Johnson testified that on the third try, she threatened to break the door down. After this threat, the Defendant opened the door. The Defendant was pulled out of the bedroom and handcuffed. The Defendant did not say anything and was holding the top of his pants up "like they weren't fastened."

Officer Johnson testified that the victim was sitting down on the bed and seemed "kind of nervous" and "kind of disheveled." MPD Officer Bradley Pecor testified that he was with Officer Johnson, that when they entered the bedroom the victim was "holding herself," and that she seemed distraught and upset. The officers found the Defendant's coat, underwear, and some flyers with the Defendant's name and phone number on the floor of the bedroom. A pink bra was found on top of the dresser in the bedroom, and a pair of torn panties was found inside one of the dresser drawers. The victim testified that she did not place her bra on the dresser or her panties in the drawer.

The victim's granddaughter testified at trial that when she went downstairs to speak with the victim, the Defendant was already in the victim's bedroom. The victim went upstairs with her and talked to her about the Defendant. The victim asked her to go downstairs and "ask [the Defendant] to take [her] to the store to get him out of the house." The victim's granddaughter testified that she went downstairs and knocked on the bedroom door. The Defendant "cracked the door" and told her that he could not take her to the store but that "he would probably take [her] later." The victim's granddaughter told the victim what the Defendant had said and went back upstairs. According to the victim's granddaughter, the victim followed her back upstairs and "laid next to [her] for a couple of minutes" before going back downstairs.

The victim's granddaughter testified that "a couple of minutes later," she heard the victim scream and then "the door slam." The victim's granddaughter testified that she continued using her computer "and then a couple of minutes after that [she] heard [her] grandmother yelling [her] name." The victim's granddaughter testified that it was unusual for the victim to yell like that and that she was very loud. She testified that the victim sounded scared. The victim's granddaughter went downstairs and heard the victim screaming her name, "help," and "call the police." The victim's granddaughter testified that

she tried to "bust" the door open but that it did not work. The victim responded by saying, "Get away, do not bust through the door. Go call the police." The victim's granddaughter testified that she called her mother "to make sure that it was okay to call the police" because she "didn't want to get in trouble for calling the policeman." After speaking to her mother, the victim's granddaughter called the police.

On cross-examination, the victim's granddaughter testified that the victim said, "[C]all the police, he['s] trying to rape me." The victim's granddaughter also admitted that she had previously been convicted of a felony, reckless endangerment with a deadly weapon. The victim's granddaughter further admitted that she had asked the victim "if she was serious" when the victim said to call the police. The victim's granddaughter testified that she "wanted to make sure that that was exactly what [the victim] wanted" because she "had made bad decisions in the past" and did not want her mother to think she was "stupid" for calling the police. The victim testified that when her granddaughter asked her if she was serious, the Defendant said, "[N]o, she's just playing."

The victim, P.A.,[1] testified at trial that she had known the Defendant, a lieutenant in the Memphis Fire Department, for "about six years." The victim testified that she met the Defendant at a local pharmacy, that they started dating "about a week" later, and that their relationship became "intimate." However, the victim eventually "tried to end" their relationship because the Defendant "was married and [she] felt he was not going to end his marriage." According to the victim, on March 19, 2012, the Defendant called her repeatedly that morning asking her "to go with him to pass out flyers" about "some property of his" that had been stolen. The victim testified that she did not initiate the phone calls that morning, that she never invited the Defendant to come over to her house, and that she repeatedly told him that she "didn't have time to be bothered with him."

The victim testified that she and her "oldest grandchild," who was visiting from college at the time, were the only people at her house that morning. According to the victim, she was in the garage playing with her dog when her granddaughter came downstairs to tell her that she was sick and staying at home that day. The victim testified that after her granddaughter went back upstairs, the Defendant "drove up behind [her] vehicle," "jumped out quickly," and "came with his hands towards [her]." The victim told the Defendant that she did not "have time to wrestle and tussle with" him because she had things to do that day. The Defendant responded that she did not have anything to do and that she was "going to take care of this first." The victim testified that she understood that to mean she "was going to take care of [his] sexual needs." The Defendant then "backed [her] into" the house.

_____

[1]It is the policy of this court to refer to victims of rape by their initials.

After the victim and the Defendant entered the house, the Defendant "backed [her] up into [a bedroom] and locked the door." The victim testified that once she and the Defendant were in the bedroom they "were kind of tussling" and "pushing" each other. The Defendant then said, "[Y]ou're going to give me this p---y today." The victim told the Defendant that it was "not going to happen" because her granddaughter was upstairs. The Defendant stated that he did not believe anyone else was in the house and that, regardless, her grandchildren all knew he was "f--king their grandmamma." The victim testified that after they "tussled a little bit," the Defendant unlocked the door so she could let her granddaughter know that he was in the house.

According to the victim, she went upstairs to talk to her granddaughter while the Defendant stayed in the bedroom. The victim testified that she told her granddaughter that she wanted to "try to get rid of" the Defendant but that if her granddaughter heard her screaming, she should "call the police." The victim asked her granddaughter to come downstairs and ask if the Defendant would "take [her] to the store" to "get him out [of] the [bed]room." When the victim's granddaughter asked, the Defendant told her that he would not take her to the store. The victim's granddaughter then went back upstairs. The victim testified that she went back to the bedroom door and told the Defendant that "this can't happen today" because she was busy.

The victim testified that the Defendant responded by grabbing her arm, pulling her into the bedroom, and saying, "[I]t's going to happen. You're going to give me this p---y today." The Defendant then "slammed the door and locked it." The Defendant also took the victim's cell phone and "threw it." The Defendant and the victim "started wrestling," and the Defendant "was trying to take [her] clothes off." The Defendant managed to rip her panties off and "unzipped [her] dress and undid [her] bra and snatched it off." During the fight, the Defendant undressed. The victim testified that she "tried with all [her] might to fight [the Defendant] off" but that he "slammed [her] on the floor" and tried to penetrate her vagina with his penis.

The victim testified that after the Defendant unsuccessfully tried to penetrate her with his penis, he "spit on his fingers and inserted them" into her vagina. The victim testified that she did not want the Defendant to do this and that she told him not to. The victim further testified that as he attacked her, the Defendant repeatedly said "give me this p---y." The victim "kind of wrestled away from" the Defendant, but he caught her and pinned her to the bed. The Defendant again attempted to penetrate her with his penis. The Defendant was once again unsuccessful, but "he put his fingers back" into her vagina. While this was happening, the victim "was screaming for" her granddaughter. Her granddaughter eventually came to the door and asked her what was wrong. The victim then yelled, "[C]all the police,

this man [is] trying to rape me, call the police." The victim's granddaughter asked if she was "sure" she wanted her to call the police, and the victim said yes.

A short time later, there was banging on the bedroom door. The victim testified that the Defendant thought it was the victim's granddaughter and her friends pretending to be the police. The police officers continued to bang on the door, and the Defendant continued to ignore them. The victim testified that she told the Defendant that he did not want the police to find him "buck naked on top of [her]," so he should answer the door. The Defendant put on some clothes and opened the door. The victim testified that the police officers grabbed the Defendant and handcuffed him as soon as he opened the door. When asked on cross-examination, the victim admitted that the Defendant had been in her house and bedroom many times before and that they had sex in her bedroom in the past. However, the victim testified that there was usually no one else in the house when they had sex. The victim also testified that she did not call the police when the Defendant first let her out of the bedroom because she wanted to resolve the situation "amicably."

MPD Sergeant Sharon Birk testified that she questioned the Defendant later that evening. The Defendant stated to Sgt. Birk that the victim was his girlfriend and that he went over to her house to "get her to help [him] distribute some flyers." The Defendant stated that when he got to the house, he went with the victim to her bedroom and that they "started making out." According to the Defendant, the victim's granddaughter came downstairs and spoke to the victim. Then both women went upstairs. When the victim came back downstairs, she and the Defendant "started back kissing, talking, wrestling."

According to the Defendant, the victim's granddaughter came downstairs again, and the victim "called out to [her] from the bedroom." The victim told her granddaughter to "call the police," and the Defendant said, "Yeah, call them." The Defendant admitted that he "put [his] finger in [the victim's] vagina." The Defendant stated that he and the victim "were in amazement" when the police actually showed up. The Defendant claimed that at no point did the victim "tell [him] to stop." The Defendant also claimed that the victim had "called out for [her granddaughter] previously during sex with [him]."

At the close of the State's proof, the State dismissed the domestic assault charge. Based upon the foregoing evidence, the jury convicted the Defendant of rape and acquitted him of the aggravated kidnapping and aggravated burglary charges. The trial court sentenced the Defendant as a Range I, standard offender to a sentence of nine years. The trial court ordered two years of the sentence to be served in confinement at one hundred percent. The trial court ordered that the remainder of the sentence be served on supervised probation.

<u>ANALYSIS</u>

*I. Sufficiency of the Evidence*

The Defendant contends that the evidence was insufficient to sustain his conviction for rape. The Defendant argues that the evidence was insufficient because of "factual inconsistencies" between the testimony of the victim and her granddaughter. The Defendant further argues that the victim consented to his actions by having "consensually returned to her lover when she otherwise had the opportunity to not do so and to seek help." The State responds that the evidence was sufficient to sustain the Defendant's conviction.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Bland</u>, 958 S.W.2d at 659; <u>see also</u> <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." <u>State v. Cooper</u>, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." <u>State v. Williams</u>, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." <u>State v. Pendergrass</u>, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. <u>State v. Dorantes</u>, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond

a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . [and] [i]f the jury is convinced beyond a reasonable doubt, we can require no more." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Rape, as pertinent to this review, is defined as the "unlawful sexual penetration of a victim by the defendant" when "[f]orce or coercion is used to accomplish the act." Tenn. Code Ann. § 39-13-503(a)(1). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body." Tenn. Code Ann. § 39-15-501(7).

As stated above, in reviewing the sufficiency of the evidence, this court presumes that any conflicts and inconsistencies in the testimony were resolved by the jury. The jury was free to weigh the testimony of the witnesses, as well as the statement the Defendant gave to Sgt. Birk, and by its verdict accredited the victim's testimony. As such, the inconsistencies that the Defendant has noted between the victim's testimony and her granddaughter's testimony do not entitle him to relief.

With respect to the Defendant's argument that the victim consented to the encounter by returning to the bedroom "when she otherwise had the opportunity to not do so and to seek help," we note that the victim testified that she went back to the bedroom door to tell the Defendant that "this can't happen today." We decline to accept the Defendant's argument that because the victim wanted to resolve things "amicably" without calling the police, her actions equated to consent for the Defendant to grab her, pull her into the bedroom, lock the door, forcibly remove her clothing, "wrestle" and "slam" her to the ground, disrobe himself, repeatedly demand for her to "give me this p---y," attempt to penetrate her vagina with his penis, and digitally penetrate her vagina all while the victim fought him, repeatedly told him no, and screamed for her granddaughter to call the police. To hold otherwise would require this court to stretch the definition of consent beyond any rational interpretation. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction.

*II. Hearsay Evidence*

The Defendant contends that the trial court erred by allowing the victim's granddaughter to testify that she heard the victim screaming her name, "help," and "call the police" because those statements were hearsay and that the excited utterance exception did not apply. The Defendant notes that the victim's granddaughter testified before the victim. The Defendant argues that when the victim's granddaughter testified, there "had been no proof that any startling event or condition had occurred." The State responds that the statements were commands; therefore, they were not hearsay because they were not offered to prove the truth of the matter asserted.

"Hearsay" is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A "statement" is "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a). Hearsay is not admissible except as allowed by the rules of evidence or other applicable law. Tenn. R. Evid. 802.

The trial court ruled that the statements were admissible under the excited utterance exception to the rule against hearsay, which allows for the admission of statements "relating to a starling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). However, we agree with the State's assertion that the victim's cries for help and pleas for her granddaughter to "call the police" were commands, and therefore, not hearsay.[2]

This court has repeatedly held that "commands, instructions, and questions often are not hearsay because they are not offered to prove the truth of their content." State v. Derek T. Payne, No. W2001-00532-CCA-R3-CD, 2002 WL 31624813, at *10 (Tenn. Crim. App. Nov. 20, 2002), perm. app. denied, (Tenn. May 19, 2003) see also State v. Lequire, 634 S.W.2d 608, 612 (Tenn. Crim. App. 1981); State v. Charles O. Emesibe, No. M2003-02983-CCA-R3-CD, 2005 WL 711898, at *10 (Tenn. Crim. App. Mar. 28, 2005), perm. app. denied, (Tenn. Oct. 17, 2005); State v. Oneal Sanford, No. E1999-02089-CCA-R3-CD, 2001 WL 681312, at *6 (Tenn. Crim. App. June 18, 2001); State v. Reginald S. Mabone, No. 02C01-9203-CR-00054, 1993 WL 270618, at *1 (Tenn. Crim. App. July 21, 1993), perm. app. denied, (Tenn. Oct. 4, 1993). Accordingly, we conclude that this issue is without merit.

---

[2]The Defendant made no objection to the victim's granddaughter's testimony during cross-examination that the victim exclaimed, "Call the police, he['s] trying to rape me." Nor has the Defendant addressed this statement in his brief to this court. As such, we limit our review to the statements objected to during the victim's granddaughter's direct testimony.

*III. Supplemental Jury Instruction*

The Defendant contends that the trial court erred in providing a supplemental instruction to the jury in response to a question from the jury during deliberations. The Defendant argues that the trial court's supplemental instruction that "[p]enetration is not required for sexual battery" was "an improper comment on the evidence" and "not a complete statement of the law." The State responds that the trial court's supplemental instruction "was an accurate statement of the law and directly addressed the jury's question."

During deliberations, the jury sent the following question to the trial court: "Does sexual battery include penetration or just touching?" The trial court stated that it was inclined "to just answer it" that sexual battery "does not require penetration" and refer the jury back to the definition of the offense in the original jury instructions. Defense counsel "suggest[ed] not giving [the jury] the answer [and] to just refer [it] to the charge." The trial court rejected defense counsel's suggestion and sent the following supplemental instruction to the jury: "Penetration is not required for sexual battery. Please refer to the elements in the charge defining the offenses."

A defendant is entitled to "a correct and complete charge of the law governing the issues raised by the evidence presented at trial." State v. Brooks, 277 S.W.3d 407, 412 (Tenn. Crim. App. 2008) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995)). In determining whether a jury instruction correctly, fully, and fairly sets forth the applicable law, we review the instruction in its entirety. Id. (citing State v. Guy, 165 S.W.3d 651, 659 (Tenn. Crim. App. 2004)). "Phrases may not be examined in isolation." Id. (citing State v. Dellinger, 79 S.W.3d 458, 502 (Tenn. 2002)). An instruction results in prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

Trial courts have "the authority to respond to jury questions with a supplemental instruction." Forbes, 918 S.W.2d at 451. The "appropriate course of action" for a trial court responding to a jury question is to "bring the jurors back into open court, read the supplemental instruction . . . along with a supplemental instruction emphasizing that the jury should not place undue emphasis on the supplemental instruction, and then allow the jury to resume its deliberations." State v. Bowers, 77 S.W.3d 776, 791 (Tenn. Crim. App. 2001). Here, the trial court simply sent a note back to the jury with its supplemental instruction. However, the Defendant has not raised any objection to the trial court's procedure in providing the supplemental instruction to the jury.

Instead, the Defendant argues that the trial court's supplemental instruction was erroneous because it "critically omitted the additional answer that penetration also does not

preclude sexual battery." As pertinent to this case, sexual battery is defined as "unlawful sexual contact with a victim by the defendant" when "[f]orce or coercion is used to accomplish the act." Tenn. Code Ann. § 39-13-505(a)(1). Sexual contact is defined as "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6).

This court has repeatedly stated that penetration is not required to support a conviction of sexual battery. See State v. Thomas D. Stricklin, No. M2005-02911-CCA-R3-CD, 2007 WL 1028535, at *14 (Tenn. Crim. App. Apr. 5, 2007) (addressing charge of aggravated sexual battery), perm. app. denied, (Tenn. Aug. 20, 2007); State v. James Ryion, No. 01C01-9511-CC-00365, 1996 WL 741557, at *6 (Tenn. Crim. App. Dec. 31, 1996) (stating that "[u]nlike aggravated sexual battery, the offense of aggravated rape required proof of sexual penetration"), perm. app. denied, (Tenn. July 21, 1997); State v. Paul Benson, No. 03C01-9307-CR-00241, 1994 WL 666892, at *4 (Tenn. Crim. App. Nov. 30, 1994) (addressing charge of aggravated sexual battery). As such, the trial court's response to the jury's question did not fail to fairly submit the legal issues or mislead the jury as to the applicable law. Accordingly, we conclude that this issue is without merit.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-10-