IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 25, 2005 Session

**JAMES ALLEN BOWERS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Bledsoe County**
**No. 56-2002      Thomas W. Graham, Judge**

———————————

**No. E2004-01734-CCA-R3-PC - Filed May 2, 2005**

———————————

The petitioner, James Allen Bowers, appeals the post-conviction court's denial of his petition for post-conviction relief.  In this appeal, the petitioner alleges (1) that he was denied the effective assistance of counsel at trial and on appeal; (2) that the state failed to disclose evidence favorable to his defense in violation of the requirements of Brady v. Maryland, 373 U.S. 83 (1963); and (3) that the post-conviction court erred by refusing to allow expert testimony on the issue of the performance of his trial and appellate counsel.  The judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Douglas A. Trant, Knoxville, Tennessee, for the appellant, James Allen Bowers.

Paul G. Summers, Attorney General & Reporter; Renee W. Turner, Assistant Attorney General; and James W. Pope, III, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In February of 1997, the petitioner was convicted of one count of rape of a child and sentenced to eighteen years' incarceration.  This court affirmed on direct appeal.  See State v. Bowers, 77 S.W.3d 776 (Tenn. Crim. App. 2002).  The facts, as summarized by this court, are as follows:

> A.S. testified that when the offense occurred, she was an eleven-year-old sixth-grade student.  At the time, her mother's friend, Sharon, was dating the [petitioner].  A.S. testified that she once spent the night with the [petitioner], the [petitioner]'s girlfriend and the [petitioner]'s three-year-old daughter by a previous marriage.  A.S. put the infant daughter to bed for the evening and began watching television on the living room couch.  She testified that the [petitioner] came into the

living room, turned on the radio, and began slow-dancing with her. The [petitioner] was wearing only a pair of shorts, and A.S. noticed that he had an erection as they danced. The [petitioner] undressed A.S. and engaged in sexual intercourse with her on a blanket on the floor.

Although A.S. initially told no one about the incident with the [petitioner], she eventually told a school friend, who then told a teacher, who in turn told a Tennessee Bureau of Investigation (T.B.I.) agent. The T.B.I. agent proposed that A.S. telephone the [petitioner] and record their conversations, during which A.S. would attempt to obtain an admission from the [petitioner] regarding his sexual activity with A.S.

Three recordings of conversations between A.S. and the [petitioner] were introduced as evidence at trial and played for the jury. The first recording occurred in February 1995, and although no specific admission was made by the [petitioner] during the conversation, the jury heard the [petitioner]'s tone of voice and concern that "the law" could be listening. Two more taped conversations occurred in August 1995, during which the [petitioner] discussed explicit sexual matters with A.S. Both of the conversations that were taped in August contained statements by the [petitioner] that could reasonably be construed by a jury to be admissions that he had engaged in sexual intercourse with A.S. at some prior time.

The next witness for the State was Jennifer Newby, the estranged wife of the [petitioner]. The majority of Jennifer Newby's testimony pertained to two recorded conversations that Jennifer Newby had with the victim, A.S. In the first of these conversations, which occurred in March 1996, A.S. denied that the [petitioner] had raped her. In the second conversation, which occurred in August 1996, A.S. confirmed that she had had no "sexual contact" with the [petitioner]. Both conversations were recorded near A.S.'s school, because of Jennifer Newby's concern that any contact between Jennifer Newby and A.S. would be met with disapproval by A.S.'s mother. The tape recordings of both of these conversations were admitted into evidence, and the jury listened to them during the trial.

Jennifer Newby and A.S. both testified that the conversations recorded in March and August of 1996 were staged and that A.S. did not tell the truth during either of the two conversations. Jennifer Newby and A.S. testified that they discussed what A.S. should say before the taping began, and A.S. testified that she cooperated in these two taped conversations because she was afraid of the [petitioner]. Jennifer Newby also testified that she assisted in these staged tape-recorded conversations because she was afraid of the [petitioner].

\*　　　　　\*　　　　　\*

-2-

The final witness for the State was James Newby, Jennifer's father. Newby testified that he had heard the [petitioner] admit to and brag about having sex with A.S. He also stated that the [petitioner] claimed he would never be caught because he was smarter than the law enforcement authorities.

Additional evidence was presented as part of the State's case in the form of a stipulation that A.S. was examined by a doctor on February 17, 1995, approximately three months after the offense. At the time of the examination, A.S. was eleven years old. The doctor who examined A.S. determined that A.S.'s hymen was not intact.

The [petitioner]'s friend, Greg Buckner, testified that he was present with the [petitioner] when each of the three recorded conversations between the [petitioner] and A.S. occurred. Buckner confirmed that the [petitioner] was abusing drugs and would become hyperactive and vulgar when under the influence of "crank." Buckner believed that the [petitioner] was clowning around and playing to a crowd of people who were also present when he was having the three recorded conversations with the victim. . . .

The [petitioner] testified that he had never engaged in sexual intercourse or sexual relations with A.S. He testified that he did not meet A.S. until just before Christmas 1994, after the time frame in which the alleged rape happened. According to the [petitioner], he was high on "crank" during the tape-recorded conversations with A.S. He testified that being under the influence of "crank" made him hyperactive and more likely to use the type of vulgar language that is heard on the tape recordings. He stated that other individuals were present during these conversations listening to his end of the conversation, and he maintained that much of the time he was simply putting on a show for these individuals. He also testified that he believed that the conversations were in fact being recorded.

Id. at 779-781.

On September 11, 2002, the petitioner filed a petition for post-conviction relief, alleging that he was denied the effective assistance of counsel at trial and on appeal, that the state engaged in prosecutorial misconduct, and that the judgment was void because it listed the wrong county of conviction.

At the evidentiary hearing, Jerry Richards, a private investigator employed by the petitioner, testified that he interviewed James Newby at the request of post-conviction counsel. According to Richards, Newby provided the following statement in writing:

On an unrecalled date [the petitioner], in a round about way told me that he had sexual intercourse with [the victim]. To the best of my recollection he said

something to the effect, ["]I bet that was the biggest dick the bitch ever had.["]  He did not tell me directly that he did, in fact, have sex with her or provide any other details.  At the time this statement was made to me I was at his house, I seen him shoot up that day and he was wired.  I don't know if he was serious when he made the statement.  He was a bull shitter and a braggart.  No one else was around when he made the statement[.]

Jimmy Miller, the victim's uncle, testified that he had pled guilty to the aggravated sexual battery of the victim in 1991.  He denied raping the victim and contended that the victim's mother attempted to extort $10,000 from him in exchange for dropping the charges.  During cross-examination, Miller claimed that he did not have a good recollection of the events in 1991 because he suffered a head injury in an automobile accident.  He conceded that the only person he had informed of the extortion attempt was his mother.

Attorney Michael Caputo, who was hired to represent the petitioner at trial, testified that he had been provided a document during pretrial discovery that stated that the victim had bite marks on her nipples and an enlarged introitus after being assaulted by Miller in 1991.  Attorney Caputo stated that this information did not alter his decision to enter into a stipulation that Dr. James Nelson would testify that the victim's hymen was not intact when she was examined after the allegations were made against the petitioner.  He explained that although the 1991 examination indicated that the victim had an enlarged introitus, it said nothing about the condition of the hymen and that a 1993 examination of the victim established that her genitalia was normal.  It was his opinion that because the 1993 examination was normal, the stipulation minimized the damage to the petitioner.

Attorney Caputo testified that if he had known that the victim had reported to a nurse at the health department that she was thirteen when she first had sex, he might have used the information at the hearing on the motion for new trial.  He stated, however, that within the same document the victim also reported that she had been sexually abused as a child.

During cross-examination, Attorney Caputo testified  that he did not want to make the jury aware of the details of Miller's conviction for aggravated sexual battery of the victim because he was afraid that the information would make her more sympathetic.  He recalled that when he attempted to cross-examine the petitioner's wife generally about Miller's conviction, the trial court sustained the state's objection to the testimony.  Attorney Caputo remembered that the medical record of the victim's 1991 examination indicated that the victim's "[i]ntroitus [was] large for [her] age suggesting but not proving penetration."

Attorney Caputo explained that he did not attempt to impeach state witness James Newby with his prior misdemeanor convictions because none of the convictions involved crimes of dishonesty.  He testified that he did question Newby about a felony theft charge that had been dismissed by the state, suggesting that it had been done in exchange for his testimony against the petitioner.  It was his opinion that Newby had little credibility because of his demeanor at trial.  Attorney Caputo conceded that he did not question Newby about his alcoholism or drug addiction

because it was his understanding that such questioning was not permitted by the rules of evidence. He stated that he did not cross-examine the victim about possible inconsistent statements she had given to rape counselors, explaining that he was unaware of such statements. According to Attorney Caputo, he was able to establish that the victim had given inconsistent accounts of the incident to a variety of people prior to trial. He stated that the victim admitted at trial that she had told several lies and had even assisted the petitioner's wife in manufacturing evidence.

Attorney David Raybin testified that he was initially hired to represent the petitioner at the hearing on the motion for a new trial. He stated that the proof of penetration was contested at the petitioner's trial and that if he had known that Miller had been indicted for the aggravated rape of the victim, he would have used that as a ground for new trial or appeal. It was his opinion that Attorney Caputo should not have stipulated the condition of the victim's hymen: "If you concede one issue like that you're conceding half the government's proof, and I wouldn't do that, knowing now what I do." Attorney Raybin testified that if he had been made aware of the victim's statement to health department officials that she did not have sex for the first time until she was thirteen, he "would have used that as powerful evidence in my [h]and to have convinced the Court [the recantation letter] was, in fact, real and the girl had truly recanted." It was his opinion that Miller's indictment for aggravated rape, the letter allegedly written by the victim recanting her trial testimony, and the health department record, together, likely would have resulted in the petitioner's being granted a new trial. Attorney Raybin further testified that it was his opinion that the state's failure to disclose the health department record amounted to a violation of Brady.

During cross-examination, Attorney Raybin acknowledged that the audiotape recordings of the petitioner's conversations with the victim corroborated her allegations. He also conceded that Attorney Caputo had done "an excellent job" of impeaching the credibility of the victim. He insisted, however, that proof of the prior allegation would have served to further impeach the victim and to impeach the medical proof that the victim's hymen was not intact.

Mel Matthews, the court bailiff and a former deputy with the Bledsoe County Sheriff's Department, was the investigating officer in the case involving Miller. He testified that the victim never alleged that Miller penetrated her vagina and only asserted that Miller fondled her. Matthews conceded during cross-examination that Miller was indicted for the aggravated rape of the victim.

At the conclusion of the hearing, the post-conviction court denied relief, concluding that the petitioner had failed to establish that his trial counsel was ineffective or that the state committed prosecutorial misconduct. The court determined that Attorney Caputo's decision to enter into a stipulation regarding the medical proof was one of trial strategy. The post-conviction court also concluded that Attorney Caputo was not ineffective for failing to further attack the credibility of Newby. The court ruled that the state did not violate the requirements of Brady by failing to disclose the health department record which contains the victim's statement that the age at which she first had sex was thirteen. Specifically, the court found that the state did not have possession of this document during trial because it was created after the trial. Further, the post-conviction court determined that "one more inconsistent statement made by a child on an embarrassing subject to a third party could

not have tilted this case in [the petitioner's] favor." Finally, the post-conviction court corrected the clerical error in the judgment so that the amended judgment correctly reflects the county of conviction.

I

The petitioner first asserts that he was denied the effective assistance of counsel at trial and on appeal. When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693 (1984). The error must be so serious as to render an unreliable result. Id. at 687. It is not necessary, however, that absent the deficiency, the trial would have resulted in an acquittal. Id. at 695. Should the petitioner fail to establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. Fields v. State, 40 S.W.3d 450, 457-58 (Tenn. 2001); see also State v. England, 19 S.W.3d 762, 766 (Tenn. 2000).

Under our statutory law, the petitioner bears the burden of proving the allegations in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2003). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). On appeal, the findings of fact made by the post-conviction court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. Brooks v.

-6-

State, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988). The burden is on the petitioner to show that the evidence preponderated against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). The credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court. Bates v. State, 973 S.W.2d 615 (Tenn. Crim. App. 1997).

The petitioner claims that his trial counsel was ineffective by failing to use a medical report which, he contends, indicates that the victim had been previously raped. He contends that this evidence could have been used to cast doubt upon the state's contention that he had caused the opening of the victim's hymen.

Dr. James Nelson examined the victim after she made allegations of sexual abuse against Jimmy Miller. His report provides that the victim suffered abrasions to her neck and bite marks to her nipples, and states that the "[i]ntroitus is large for age, suggesting but not proving penetration." A separate document within the victim's medical records indicates that the victim's genitalia was "normal" during a medical examination conducted two years later. Two years after the second examination, an examination conducted as a result of the victim's allegations against the petitioner established that the victim's hymen was no longer intact. Attorney Caputo testified that he chose to enter into a stipulation that the victim's hymen was not intact in an effort to minimize the effect of the presentation of the medical testimony directly to the jury. It was his opinion that the medical evidence of the 1991 examination might have caused the jury to be more sympathetic to the victim, particularly because the 1991 medical record did not contain definitive proof of previous penetration. The post-conviction court ruled that Attorney Caputo's decision qualified as sound trial strategy.

In our view, the evidence does not preponderate against the finding of the post-conviction court. In Hellard v. State, our supreme court held that perfect representation is not required and that trial counsel's performance should not be measured by hindsight:

> "Hindsight can always be utilized by those not in the fray so as to cast doubt on trial tactics a lawyer has used. Trial counsel's strategy will vary even among the most skilled lawyers. When that judgment exercised turns out to be wrong or even poorly advised, this fact alone cannot support a belated claim of ineffective counsel."

629 S.W.2d 4, 9 (Tenn. 1982) (quoting Robinson v. United States, 448 F.2d 1255 at 1256 (8th Cir. 1971)). Our high court, quoting United States v. DeCoster, 487 F.2d 1197, 1201 (1973), ruled that appellate courts should not "'second guess strategic and tactical choices made by trial counsel'" and that it is only "'when counsel's choices are uninformed because of inadequate preparation, a defendant is denied the effective assistance of counsel.'" Id. The high court explained:

> It cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics. As former trial lawyers, we know that a criminal trial is a very dramatic, vibrant and tense contest involving many variables and that counsel must make quick and

-7-

difficult decisions respecting strategy and tactics which appear proper at the time but which, later, may appear to others, or even to the trial lawyer himself, to have been ill considered.

Id. at 9-10 (citation omitted).

In retrospect, it may have been a better strategy to have insisted upon medial proof which would have included testimony about the 1991 assault of the victim. The 1991 medical report did not, however, conclusively state that the victim's hymen had been torn. Moreover, the examination of the victim conducted two years after the allegations against Miller but two years before the allegations against the petitioner established that the victim's genitalia was normal. It is at least possible that the jury might have reacted negatively to trial counsel's use of the 1991 report as proof that Miller, rather than the petitioner, caused the opening of the victim's hymen. Further, the decision to enter into the stipulation so as to minimize the impact of live medical evidence qualifies as a reasonable trial strategy. In consequence, the petitioner is not entitled to relief on this issue.

The petitioner also claims that his trial counsel was ineffective by failing to investigate the prior criminal record and prior bad acts of state witness James Newby because such evidence could have been used to impeach the credibility of the witness. The state submits that the petitioner has waived our consideration of this issue by failing to cite to the record, failing to develop his argument, and failing to cite to any relevant authority. In the alternative, the state asserts that Attorney Caputo was not deficient.

Initially, the petitioner has failed to support this issue with argument or citation to authorities. Moreover, he has failed to include appropriate references to the record. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7); State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987).

More importantly, the petitioner is not entitled to relief on the merits of his claim. At the evidentiary hearing, Attorney Caputo testified that he was aware of Newby's prior record of misdemeanor convictions. Because none of the convictions involved dishonesty, it was Attorney Caputo's opinion that he would not have been permitted to ask Newby about them at trial. Attorney Caputo recalled that he did cross-examine Newby about a felony theft charge that had been dismissed by the state after he agreed to be a witness against the petitioner.

Tennessee Rule of Evidence 609 governs the use of prior criminal convictions to impeach a witness. That rule provides that "evidence that the witness has been convicted of a crime may be admitted if . . . the crime [is] punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement." Tenn. R. Evid. 609(a). Because none of Newby's prior convictions, which were all for misdemeanor offenses, involved dishonesty or false statement, Attorney Caputo

would not have been permitted to use them to cross-examine him. In our view, Attorney Caputo was not ineffective for failing to do that which is prohibited by the Rules of Evidence.

The petitioner next contends that Attorney Caputo was ineffective by failing to use the inconsistent statements given by the victim to the Department of Human Services, the Rape Crisis counselor, and the jury. The state submits that the petitioner has waived this issue by failing to provide references to the record, failing to develop his argument, and by failing to cite relevant authorities. In the alternative, the state asserts that the petitioner failed to establish his claim by clear and convincing evidence because he failed to present proof of the inconsistent statements.

As the state correctly points out, the petitioner has waived our consideration of this issue. Waiver notwithstanding, the petitioner is not entitled to relief. While he claims that Attorney Caputo should have used inconsistent statements provided by the victim, he did not present any statement made by the victim at the evidentiary hearing. In Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990), this court placed the burden on the post-conviction petitioner to produce that testimony which he contends may have been helpful. No one was called to corroborate the claim that the victim made inconsistent statements. Further, the record establishes that Attorney Caputo cross-examined the victim thoroughly about certain inconsistent statements she made to her mother and the petitioner's ex-wife about the allegations. In our view, the evidence does not preponderate against the finding of the post-conviction court that the petitioner was not prejudiced by any inaction on the part of Attorney Caputo.

## II

The petitioner next contends that the state violated the requirements of Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose a document created by the health department in 1998 wherein the victim reports that she had sex for the first time at age thirteen. He also complains that his trial counsel was ineffective for failing to discover this document. The state submits that there was no Brady violation and trial counsel was not ineffective because the petitioner is prohibited by statute from having access to the victim's records and because the document was created after the petitioner's trial.

In the landmark case of Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court ruled that a prosecutor has a duty to furnish exculpatory evidence to the defendant upon request. Exculpatory evidence may pertain to the guilt or innocence of the accused and/or the punishment which may be imposed if the accused is convicted of the crime. State v. Marshall, 845 S.W.2d 228, 232 (Tenn. Crim. App. 1992). Any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. Thus, the duty to provide arises when the evidence is material, the evidence is favorable for the defense, and a proper request for production is made by the defendant. See United States v. Bagley, 473 U.S. 667, 675 (1985); Strouth v. State, 755 S.W.2d 819, 828 (Tenn. Crim. App. 1986). Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. United States

v. Agurs, 427 U.S. 97 (1976). "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the state's witnesses." Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn. 2001) (citing Bagley, 473 U.S. at 676; State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995); State v. Copeland, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998)).

Before this court may find a due process violation under Brady, the following elements must be established:

1.  The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the state is bound to release the information whether requested or not);
2.  the state must have suppressed the information;
3.  the information must have been favorable to the accused; and
4.  the information must have been material.

State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995) (as amended on rehearing).

Although Attorney Caputo recalled making a general discovery request in this case, the motion does not appear in the record. There is also no indication that the petitioner specifically requested discovery of the victim's health department records. Further, it is unclear whether the petitioner would have been entitled to the document had he requested it. Tennessee Code Annotated section 37-1-612 mandates that all records of child sexual abuse remain confidential. The statute grants access to the records only to "(a) law enforcement officers investigating child sexual abuse, (b) the district attorney general, (c) grand jurors through power of a subpoena, (d) those engaged in genuine research and audits, (e) probation officers or the like charged with presenting information in judicial or administrative proceedings, and (f) those treating the child." State v. Gibson, 973 S.W.2d 231, 244 (Tenn. Crim. App. 1997) (citing Tenn. Code Ann. § 37-1-612).

In Gibson, the defendant alleged that the trial court erred by denying him access to the child victim's records from the Department of Human Services. This court concluded that the trial court did not err by denying the petitioner's request because Tennessee Code Annotated section 37-1-612 does not list the alleged abuser as a party who may have access to such records. Id. In State v. James Dison, No. 03C01-9602-CC-00051 (Tenn. Crim. App., at Knoxville, Jan. 31, 1997), this court held that Dison was not permitted under either Tennessee Rule of Criminal Procedure 16 or Brady to inspect the victim's entire file from the Department of Human Services.

In our view, the petitioner was not entitled to the record in question. Because the petitioner would not have been entitled to the record, even if he had requested it, the state did not violate the requirements of Brady by failing to disclose the document. Thus, Attorney Caputo was not ineffective for failing to discover and utilize at trial a document to which he had no entitlement.

Second, and more importantly, the document in question was created in 1998, more than a year after the conclusion of the petitioner's trial. In consequence, it is our view that the state did not

violate the requirements of <u>Brady</u> by failing to disclose a document that did not exist. Obviously, Attorney Caputo was not ineffective by failing to discover a non-existent document.

Moreover, even if the document did exist and the petitioner was entitled to it, it is our view that no <u>Brady</u> violation occurred because the petitioner has failed to establish that the document was exculpatory. In the document, which appears to be a questionnaire created by the health department for patients seeking family planning advice, the victim lists the age at which she first had sex as thirteen. Within the same form, however, the victim indicates that she had previously been sexually abused. In our view, the victim's statement that she first had sexual intercourse at age thirteen does not necessarily contradict her claim that she was raped by the petitioner at an earlier age. In consequence, the petitioner is not entitled to relief on this issue.

III

As his final issue, the petitioner contends that the post-conviction court erred by prohibiting Attorney Raybin, who had been qualified as an expert witness, to testify as to the ultimate issue of the effectiveness of trial counsel. The state submits that the petitioner has waived our consideration of this issue by failing to support it with argument, citation of authority, and references to the record. In the alternative, the state asserts that the post-conviction court did not abuse its discretion by limiting the testimony.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. <u>McDaniel v. CSX Transp., Inc.</u>, 955 S.W.2d 257 (Tenn. 1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702. "To give expert testimony, one must be particularly skilled, learned or experienced in a science, art, trade, business, profession or vocation. The expert must possess a thorough knowledge upon which he testifies that is not within the general knowledge and experience of the average person." <u>Otis v. Cambridge Mut. Fire Ins. Co.</u>, 850 S.W.2d 439, 443 (Tenn. 1992) (citing <u>Kinley v. Tennessee State Mut. Ins. Co., Inc.</u>, 620 S.W.2d 79, 81 (Tenn. 1981)). Further, Tennessee Rule of Evidence 704 provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Tenn. R. Evid. 704.

Generally, the admission of expert testimony is largely entrusted to the sound discretion of the trial court. <u>State v. Ballard</u>, 855 S.W.2d 557, 562 (Tenn. 1993). The trial court's decision may be overturned on appeal only upon a showing that the trial court abused its discretion. <u>Id.</u> "The abuse of discretion standard contemplates that before reversal the record must show that a judge 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" <u>State v. Coley</u>, 32 S.W.3d 831, 833 (Tenn. 2000)

-11-

(quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)); see also State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997).

In this case, the post-conviction court permitted Attorney Raybin to be qualified as an expert witness on the issue of Attorney Caputo's performance and ruled that he could testify as to "the degree of knowledge, skill, prudence, and diligence, which is commonly possessed and exercised by lawyers and the standard of care in the community to which they're testifying." The court determined, however, that Attorney Raybin would not be permitted to offer an opinion as to whether Attorney Caputo was ineffective, concluding that "that's just for the judge to do the best he can with what he believes, once all that's presented." The record establishes, however, that Attorney Raybin did, in fact, offer his expert opinion as to whether the deficiencies in Attorney Caputo's performance undermined confidence in the jury verdict. He stated that "putting all these things together, . . . it would have been a different result." Although the post-conviction court should not have prevented Attorney Raybin from offering his opinion on the ultimate issue, see Tenn. R. Evid. 704, any error can be classified as harmless. Attorney Raybin actually offered his opinion that trial counsel was ineffective. In consequence, the petitioner is not entitled to relief.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE

-12-