IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 10, 2024

**EDWARD PARNELL PORTER v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Marshall County
No. 18CR138 (PC)  Forest A. Durard, Jr., Judge**

_____

**No. M2023-00756-CCA-R3-PC**

_____

Petitioner, Edward Parnell Porter, appeals the denial of his post-conviction petition, arguing that the post-conviction court erred in finding that he received the effective assistance of counsel at trial.  Following our review of the entire record and the briefs of the parties, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Nicholas W. Utter, Fayetteville, Tennessee, for the appellant, Edward Parnell Porter.

Jonathan Skrmetti, Attorney General and Reporter; Christian N. Clase, Assistant Attorney General; Robert J. Carter, District Attorney General; and William Bottoms and Lee Brooks, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

On May 6, 2018, Petitioner and Lanita Wade, who had been dating for approximately two years, were traveling in Petitioner's truck when they got into a verbal altercation.  The two had "a little to drink" while visiting friends prior to the altercation, and Ms. Wade testified that she hit Petitioner first because she believed that he was going to hit her.  *State v. Porter*, No. M2019-01377-CCA-R3-CD, 2020 WL 5914625, at *1 (Tenn. Crim. App. Oct. 6, 2020).  Petitioner then hit Ms. Wade, who was riding in the passenger seat, on the left side of her face near her eye.  *Id.*  Ms. Wade became afraid and

got into the back seat of the truck to get away from Petitioner; however, they continued scuffling. *Id.* Petitioner then pulled over, got out of the truck, opened the back passenger door, and dragged Ms. Wade out of the vehicle by her feet, causing her head to hit the door frame. *Id.* Petitioner also kicked Ms. Wade in the face multiple times while she was on the ground. *Id.* At that point, she was unable to defend herself and lost consciousness. *Id.* The last thing Ms. Wade remembered was Petitioner standing on top of her and "his foot coming down on [her] face." *Id.* She later woke up alone and barefoot in the middle of the road near a Tennessee Department of Transportation ("TDOT") facility. Ms. Wade did not have a cell phone and began walking toward Lewisburg. *Id.* She was in pain, felt dizzy, and her left eye was swollen shut. *Id.* Ms. Wade walked to a McDonald's, and the employees there immediately helped her. *Id.* One of them gave her a pair of shoes. *Id.* On cross-examination, Ms. Wade acknowledged that at the preliminary hearing, she testified that she saw Petitioner walking away from her, and she did not know how long she was unconscious before she got up and began walking toward Lewisburg. *Id.*

Ms. Wade was eventually transported to the Marshall Medical Center where she was treated for her facial injuries. Hospital employee Brandy Humphrey photographed Ms. Wade's injuries and observed that the entire side of Ms. Wade's face was "swollen and black," and her eye was swollen shut and also black and blue. *Id.* at *2. She had some bruising on one of her arms as well as a bruise on her breast. *Id.* Ms. Humphrey also noted that Ms. Wade was "distraught, and was crying, upset and tired, in pain." *Id.* Deputy Alva Jerel Neal was dispatched to the hospital and spoke with Ms. Wade and also photographed her injuries. *Id.* He testified that Ms. Wade's "eye was closed. She had an injury to one of her arms. She had a couple of scratches on her chest area[.]" *Id.* Deputy Neal testified that the distance from the area where the incident occurred, near the TDOT facility, to McDonald's was 3.8 miles, and it was 2.4 miles from the TDOT facility to the first street light. *Id.*

At trial, Ms. Wade testified that she still experienced facial pain, and her eye did not open completely. *Id.* She also experienced "white flashes and black spots in her vision." *Id.* On cross-examination, Ms. Wade agreed that she reported a pain level of nine out of ten when she arrived at the Marshall Medical Center after the altercation with Petitioner, and she did not have any broken bones. *Id.* She further agreed that on June 3, 2018, she went to the Maury Regional Medical Center after being involved in a car accident, and she hit her head on the dashboard during the accident. *Id.* At the hospital, Ms. Wade reported a pain level of ten out of ten. *Id.* She again went to the Maury Regional Medical Center eleven days later due to a toothache and reported a pain level of ten out of ten. *Id.* On redirect examination, Ms. Wade testified that she no longer had pain in her head from the car accident; however, she still had pain from where Petitioner kicked her in the head. She also said that she had periodic lingering pain from her tooth. *Id.* at *2. Ms. Wade testified that her eye occasionally hurt. She agreed that "regardless of whether she had previously testified that she saw [Petitioner] walking away, she lost consciousness at some point and

- 2 -

did not recall seeing him drive away.  [Petitioner] was not there when she regained consciousness." *Id*.

Petitioner was convicted of aggravated assault, domestic assault, and misdemeanor reckless endangerment.  His convictions for domestic assault and aggravated assault were merged and he was sentenced to eight-and-one half years plus eleven months, twenty-nine days to be served consecutively to a "federal sentence and any unexpired sentence."  On direct appeal, this court affirmed Petitioner's convictions and sentence.  *Porter*, 2020 WL 5914625, at *1.

On March 16, 2022, Petitioner filed a pro se petition for post-conviction relief alleging that his convictions were based on a violation of the protection against double jeopardy and numerous grounds of ineffective assistance of counsel.  Counsel was appointed, and an amended petition was filed alleging additional grounds of ineffective assistance of counsel.

At the post-conviction hearing, co-counsel[1] testified that he worked as an assistant public defender and began representing Petitioner in general sessions court.  A plea offer was made by the State for Petitioner to plead guilty to a "misdemeanor assault or a misdemeanor domestic assault."  Co-counsel testified: "Of course that would have been 11 months and 29 day maximum sentence, but I believe his offer was 6 months initially to serve and the remainder on probation."  He and Petitioner had conversations about the offer, and Petitioner "was adamant he would not accept that offer."  Co-counsel also conducted Petitioner's preliminary hearing during which Ms. Wade testified.

Co-counsel vaguely recalled reviewing the discovery in Petitioner's case after the preliminary hearing.  He and lead counsel attempted to have Petitioner visit their office, but they had a difficult time scheduling appointments with him.  When Petitioner did show up "it seemed like he was not there long."  Co-counsel recalled that he and lead counsel had conversations about Ms. Wade's medical records, but he did not recall if he had any conversations with Petitioner about the records.  Co-counsel testified:

> It seems like there was an issue of whether or not of course the medical records were going to be entered into evidence.  I think [lead counsel] eventually had a discussion with the District Attorney's Office about excluding those and stipulating that she could testify that she did seek medical treatment, and that we would keep the medical records out.  We did not feel they would be beneficial and potentially be detrimental to the case.

---

[1] Petitioner was represented by two attorneys at trial.  We will refer to them as lead counsel and co-counsel, and collectively as trial counsel or counsel.

Co-counsel agreed that Ms. Wade's medical records included the triage notes of statements that Ms. Wade made to the medical providers. The notes included a statement that Ms. Wade was "struck with a fist, pulled out of her vehicle and kicked in the face, unknown loss of consciousness." Ms. Wade did not have back or neck pain or any pain below her waist. She complained of "notable swelling to the left side of her face and pain to the trunk region." Co-counsel discussed this information with lead counsel and agreed they would stipulate at trial that Ms. Wade was treated at the Marshall Medical Center, that her chest and face were bruised and swollen, that there were no bone fractures observed, and medical personnel were unable to determine if Ms. Wade's eye had "internal structural damage."

Co-counsel testified that his office was concerned about the injury to Ms. Wade's eye, which one photograph showed was swollen shut. It was noted in the medical records that medical personnel could not determine if there was severe damage to Ms. Wade's eye or socket because it was so swollen. Co-counsel did not recall if he and lead counsel sought additional medical records concerning Ms. Wade's eye.

Co-counsel recalled his cross-examination of Deputy Neal who described the location where Ms. Wade said Petitioner pushed her from his truck. He thought Deputy Neal acknowledged that Ms. Wade walked by several houses and that there were opportunities for her to stop for help before reaching McDonald's. Co-counsel did not recall if he asked Deputy Neal about Ms. Wade's statements to him which were inconsistent with her trial testimony.

Lead counsel, who also worked as an assistant public defender and represented Petitioner in general sessions court, testified that Petitioner was initially offered a plea deal of six months for domestic assault. Lead counsel testified: "We passed that on to [Petitioner], who was very clear he was not taking that offer. He wanted a trial. He fully believed that he did not do anything. He was defending himself." After the case progressed to circuit court, Petitioner was also given a plea offer of eleven months, twenty-nine days, all of which would be suspended after the service of thirty days, for reckless endangerment. Lead counsel and co-counsel strongly encouraged Petitioner to accept the offer, but he rejected it. Lead counsel agreed that he reviewed the elements of aggravated assault, penalties, and potential jail exposure with Petitioner. Lead counsel noted that he "handled the case in [c]ircuit [c]ourt primarily and [co-counsel] came on for the trial."

Lead counsel testified that he was provided with discovery which consisted of Ms. Wade's medical records from the Marshall Medical Center, photographs that Deputy Neal took of Ms. Wade's injuries, and a witness list. He received *Jencks'* material from the State "two weeks or so before the trial" that included Deputy Neal's report which was used to prepare for cross-examination. Deputy Neal was cross-examined by co-counsel. Lead counsel testified that he received an additional discovery response a few weeks before trial that consisted mostly of Ms. Wade's medical records from Maury Regional Medical Center where she visited three times in the six weeks after this incident related to a car accident

and a toothache. There were also records from the Center of Hope and a list of additional potential witnesses. Lead counsel was aware that during the car accident, Ms. Wade hit her head or face on the dash. His office reviewed the supplemental discovery and pulled out any useful information. Lead counsel testified:

> What I found [that] was helpful to [Petitioner] was when I looked at them she had the car wreck, she hit her forehead on the dashboard. She did not go to the hospital immediately, she went the next day reporting pain still. They did all of the usual testing but there was no reports of anything we could use that maybe cause[d] this eye injury she is still claiming. She did report a 10 out of 10 pain, but a day later from hitting her head on the dashboard. She reported a 9 out of 10 of pain from this initial incident with [Petitioner] herself. We were trying to use these records, and the same with the June 14th record regarding a toothache where she also reported a 10 out of 10 pain. We tried to use those records to show that 6 weeks later she was in even worse pain than she claimed to be here. So we were trying to get ahead of the extreme physical pain argument.

Lead counsel testified that he did not file a motion in limine concerning the supplemental medical records because it was his understanding that the State did not plan to introduce them.

Lead counsel was aware that Ms. Wade was referred to Vanderbilt University Medical Center ("VUMC") by the Maury Regional Medical Center Emergency Room for an ophthalmology appointment because Ms. Wade was still reporting eye pain from the incident with Petitioner. Lead counsel did not attempt to obtain any records from VUMC because the Center of Hope records indicated that Ms. Wade said that nothing was found during the ophthalmology appointment. He further testified:

> And so the reason I didn't try to get those records at that time was I felt like that would leave us in the exact same position we were after the stipulation, because in the stipulation we said that Marshall Medical could not find any damage to her eye. I felt like we would be in the exact same place with other records saying there was no damage. But we also told the jury that 9 days later she was still complaining about problems with her eye. Whereas at the trial since I didn't bring those up that never came out. So just I could see it both ways. I could see using them or not using them, and I went with not using them. I'm sure that is clear as mud now.

Lead counsel asserted that he thought it would be "safer to keep it with one hospital saying we can't find any damage than saying there [are] two hospitals saying they can't find damage[,] but she is also still complaining with pain, so I felt like that would bolster her claim of I have an eye injury."

Lead counsel noted that he and co-counsel attempted to contact Petitioner between court dates. He said:

> [Petitioner] was employed at that time so I would imagine it was difficult for him to take calls. But a lot of times we would get him on the phone he didn't want to talk on the phone. He seemed very irritated and wanted to get off the phone as quickly as possible. A lot of our discussions took place on scheduled court dates[.]

Lead counsel testified that Petitioner came into the office one time. He said that Petitioner was provided with a copy of discovery at some point, and they discussed it with him.

Lead counsel testified that Petitioner's main argument at trial was self-defense because Ms. Wade "admitted that she attacked [Petitioner] first while he was driving the vehicle. But with the proportionate response being an aspect of self-defense it also helps, it also dovetails into an argument over whether or not there was actual serious bodily injury." Lead counsel agreed that medical records are typically not the only medical proof introduced at trial. He said that Ms. Wade could testify as to her injuries, and the State could also call a physician to testify. Concerning whether Ms. Wade's statements in the medical records were consistent with her testimony at the preliminary hearing and trial, lead counsel testified:

> I agreed they were pretty close. However, what stands out to me reading her basic part of the triage notes, it left out all aspect of the self-defense part of her attacking him. It feels like - - the notes feel like it was written by somebody else taking down quick notes from what she was saying so they left out a lot of the details. So it sounds like a straight up assault by [Petitioner], I just did not want the jury hearing that. We were aware of it. We knew what it said, but her own testimony that she assaulted him first I felt was much better than bringing in she was assaulted by her significant other. He punched her and kicked her in the face and she had unknown loss of consciousness. I feel like the unknown loss of consciousness statements in there as well gave strength to her claims that she was knocked unconscious when the other statements that we used like in her preliminary hearing where she said she watched him walk away or the statement she made to Deputy Neal that she was pushed out of the vehicle and watched him drive off that those were more in disagreement with what she said at the trial that he pulled her out of the car and knocked her out and she didn't even know he left. So I felt those two other statements were the better ones to cross[-]examine her with, whereas this one corroborated that so I wanted to stay away from these.

Lead counsel said that was his reason for filing a motion in limine to exclude Ms. Wade's prior statements at trial. He said that Petitioner was not consulted prior to filing the motion. Lead counsel agreed that there was a stipulation concerning the medical records and that Petitioner did not participate in the discussion concerning the stipulation. Lead counsel said, "We told him what we were doing."

Lead counsel testified that he had a transcript of Ms. Wade's testimony at the preliminary hearing, which he used to cross-examine her at trial. He noted that Ms. Wade changed her testimony at trial "to he kicked her in the head and she was immediately unconscious verses at the preliminary hearing where she said - - I believe she still said he kicked her in the head, but she watched him walk away and then passed out." Lead counsel testified that he pointed out the inconsistency and cross-examined Ms. Wade about it. He also agreed that Deputy Neal's report reflected that Ms. Wade said Petitioner pushed her out of the vehicle into the ditch and drove away, and then she started walking. Ms. Wade did not mention unconsciousness. There was a dispute at trial as to whether Ms. Wade landed in the ditch or was lying in the middle of the road. Lead counsel testified that he used Deputy Neal's report during Deputy Neal's cross-examination rather than Ms. Wade's cross-examination because he did not want to give Ms. Wade an opportunity to explain what she really meant. Lead counsel said Deputy Neal testified at trial that Ms. Wade told him that Petitioner pushed her out of the vehicle, and she watched him drive away. Lead counsel pointed out that at trial was the "first time we had any sworn testimony where Ms. Wade claimed that she was flat out unconscious." He agreed that he relied on the State's witnesses to attack Ms. Wade's credibility.

Lead counsel testified that a couple of times during court appearances, he and co-counsel discussed with Petitioner his right to testify. They gave the usual advice of telling Petitioner not to make a final decision until all of the State's proof was presented at trial. However, lead counsel and co-counsel reminded Petitioner of his prior federal drug conviction, which they felt would be admitted for impeachment purposes if he testified at trial. Lead counsel thought what Petitioner "would be able to add was outweighed by what we would lose by that conviction coming in." Lead counsel testified that Petitioner understood and was not forced into any decision about testifying and "begrudgingly" "made the decision himself[.]" Lead counsel further asserted:

> There was also a much more minor issue of just the jury being able to get a good look at him. [Petitioner] is - - he is on the far side of the courtroom from the jury box right now, which is where he would have been sitting during trial, but again the sizes, the relative sizes of the two people is also a factor in self-defense and be less of a chance for the jury to get a look at the 6-foot tall [Petitioner] versus the 4'11" to 5 foot tall Lanita Wade and get a close look. But the largest by far reason was that record of that conviction I felt like would really hurt.

On cross-examination, lead counsel testified that the trial court in this case conducted a *Momon*[2] hearing at the close of the State's proof concerning Petitioner's decision about whether to testify. Lead counsel agreed that his strategy in Petitioner's case was to advise him not to take the stand because of his criminal record and the impact the size difference between him and Ms. Wade could have on their theory of self-defense. However, lead counsel said that "the largest reason was his record. Because if the jury thought that was all he could do to get her to stop then her injuries were explainable[.]"

Petitioner testified that his attorneys did not discuss the stipulations concerning Ms. Wade's medical records with him. He was also unaware of the motion in limine addressing the medical records, and he did not have the option to "agree or disagree with it." Petitioner testified, "I feel that based on aggravated assault, the basis of the aggravated assault is serious bodily injury and I could not defend myself properly without the medical records, or I could not defend against any accusations of injury without [the] medical record." Thus, he felt that self-defense was the only argument that could be presented because the medical records were "struck" by counsel.

On cross-examination, Petitioner asserted that counsels' failure to admit Ms. Wade's medical records at trial hampered the ability to defend his case. He agreed that lead counsel cross-examined Ms. Wade at trial about inconsistencies in her testimony. Petitioner further agreed that there was nothing in the medical records supporting his self-defense claim that Ms. Wade hit him first. Petitioner testified that he and trial counsel had a discussion in the middle of trial about whether he would testify. He made the decision not to testify "[b]ased on the information given to [him]."

Following the hearing, the post-conviction court entered an order denying the post-conviction petition. The court made extensive findings and concluded that Petitioner failed to show deficient performance by trial counsel.

**Analysis**

Petitioner contends that he received the ineffective assistance of counsel in this case because trial counsel: 1) "stipulated to the contents of certain medical records" without Petitioner's consent; 2) failed to request Ms. Wade's ophthalmology records; 3) failed to adequately advise him concerning self-defense and whether he should testify at trial; 4) failed to effectively cross-examine Ms. Wade; and 5) "was deficient to such an extent as to deprive [Petitioner] of a fair trial."[3] The State responds that Petitioner has not

---

[2] *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999) (establishing the standard of knowledge a defendant must demonstrate to waive their constitutional right to testify).

[3] Petitioner raised other issues in his post-conviction petition and amended petition. We address only those issues raised on appeal.

demonstrated that trial counsel rendered deficient performance as to any of Petitioner's claims, and he has not shown any prejudice.

The right to the effective assistance of counsel is safeguarded by both the Constitution of the United States and the Constitution of Tennessee; therefore, it is cognizable under the Post-Conviction Relief Act. U.S. Const. amend VI; Tenn. Const. art. I, § 9; T.C.A. § 40-30-103 ("Relief under this part shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States."). A petitioner alleging the ineffective assistance of counsel "shall have the burden of proving the allegations of fact by clear and convincing evidence." T.C.A. § 40-30-110(f); *Dellinger v. State*, 279 S.W.3d 282, 291 (Tenn. 2009). When a petitioner asserts ineffective assistance of trial counsel, he bears the burden of showing that (1) counsel's performance was deficient and (2) the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Butler v. State*, 789 S.W.2d 898, 899 (Tenn. 1990). Failure to satisfy either prong is sufficient to deny relief. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004); *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) ("[I]f this Court determines that either prong is not met, we may forego consideration of the other prong.").

A claim of ineffective assistance of counsel presents a mixed question of law and fact. *Pylant v. State*, 263 S.W.3d 854, 867 (Tenn. 2008) (citing *Finch*, 226 S.W.3d at 315). Thus, an appellate court is bound by the factual findings of the post-conviction court unless the evidence in the record preponderates against those findings; but the post-conviction court's application of law to those factual findings is reviewed de novo with no presumption of correctness. *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (citing *Dellinger*, 279 S.W.3d at 293); *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001)).

*I.      Stipulation to Ms. Wade's Medical Records Without Petitioner's Consent*

Petitioner contends that trial counsel rendered deficient performance by stipulating to a portion of Ms. Wade's medical records from the Marshall Medical Center for her treatment resulting from the altercation with Petitioner, without his knowledge and consent, rather than admitting the complete records at trial. Concerning this issue, the post-conviction court found:

Regarding the issue of the medical records, [lead] counsel stated he received discovery and reviewed the same. He further testified it was his practice to review with his clients whenever possible. Notable is the fact [lead] [] counsel stated he had difficulty in communicating with Petitioner. Petitioner would not talk with [lead] [] counsel on the phone and, perhaps, that was difficult when Petitioner was at work. Petitioner, according to [lead] [] counsel, only met with him once in his office and most of the conversations with Petitioner were when they were in court. There is no evidence this was

- 9 -

not sufficient though. Representation is a cooperative effort between counsel and client and the client must make themselves available at reasonable times to further the representation.

Petitioner complains the issue of serious bodily injury could not be defended without the medical records and that he was not consulted about the stipulation. The stipulation specifically acknowledged "no bone fractures were observed in the face, wrist or skull. No internal damage to Ms. Wade's eye could be determined."

Petitioner appears to rely solely upon the injury to Ms. Wade's eye as the reason serious bodily injury was found. This is misplaced. The appellate court found other injuries in addition to the eye injury to conclude Ms. Wade suffered serious bodily injury. *Porter*, [2020 WL 5914625] at *6. For instance, the appellate court noted Ms. Wade, at the time of trial was still experiencing facial pain, her eye did not completely open and she was having "white flashes and black spots" in her vision. The appellate court concluded this met the definition of serious bodily injury. [Lead] [] counsel stated he reviewed the supplemental discovery provided about three weeks before trial. Maury Regional Hospital dated March 15, 2018, according to counsel, noted seeing victim for eye pain and [she] was referred to [VUMC]. Though counsel did not review the [VUMC] records[,] the same was referenced in the Center of Hope records indicating that nothing was found at [VUMC]. Even if this information was before the jury, it would not have had a reasonable probability of undermining the outcome since there was other evidence in which to conclude Ms. Wade had suffered serious bodily injury. The Petitioner has failed to prove these facts by [clear] and convincing evidence and trial counsel's choice in stipulating the records was not unreasonable.

(emphasis in original).

The record in this case does not preponderate against the post-conviction court's findings. Lead counsel acknowledged that Petitioner was employed at the time of trial and that it may have been difficult for him to accept calls. However, lead counsel testified that many times when he and co-counsel reached Petitioner by phone, Petitioner did not want to talk, seemed irritated, and wanted to get off the phone as quickly as possible. Therefore, many of their discussions with Petitioner took place on scheduled court dates. Petitioner met with lead counsel and co-counsel one time in their office and did not stay long. Although Petitioner did not participate in the discussion concerning the stipulation, as a result of his own difficulty in communicating with counsel, lead counsel said: "We told him what we were doing." There was nothing presented at the post-conviction hearing indicating that Petitioner objected to the stipulation at the time.

- 10 -

Furthermore, although not specifically found by the post-conviction court, lead counsel and co-counsel clearly made a strategic decision to stipulate to portions of Ms. Wade's medical records. The defense strategy in this case was that Petitioner acted in self-defense. Co-counsel testified that lead counsel had a discussion with the District Attorney General's Office about the stipulation and excluding the medical records. He said that he and lead counsel did not feel that the records would be beneficial to Petitioner's case and that they would belie Petitioner's self-defense claim and be "potentially detrimental to the case." The records included a statement that Ms. Wade was "struck with a fist, pulled out of her vehicle and kicked in the face, unknown loss of consciousness." She also complained of "notable swelling to the left side of her face and pain to the trunk region." Lead counsel testified that the triage notes from the medical records "left out all aspects of the self-defense part of her attacking him" first, and "it sounds like straight up assault by [Petitioner], I just did not want the jury hearing that." Lead counsel further testified: "We knew what it said, but her own testimony that she assaulted him first I felt was much better than bringing in that she was assaulted by her significant other." He also felt:

> like the unknown loss of consciousness statements in there . . . gave strength to her claims that she was knocked unconscious when the other statements that we used like in her preliminary hearing where she said she watched him walk away or the statement she made to Deputy Neal that she was pushed out of the vehicle and watched him drive off those were more in disagreement with what she said at the trial that he pulled her out of the car and knocked her out and she didn't even know he left. So I felt those two other statements were the better ones to cross[-]examine her with, whereas this one corroborated that so I wanted to stay away from these.

Trial counsels' decision to stipulate to portions of Ms. Wade's medical records was a strategic one that was made with adequate information as a result of trial preparation and will not be second-guessed by this court. *Hellard v. State*, 629 SW.2d 4, 12 (Tenn. 1982); *Tolliver v. State*, 629 S.W.2d 913, 914 (Tenn. Crim. App. 1981). Trial counsels' performance concerning this issue was not deficient nor has Petitioner shown that he was prejudiced by counsels' performance. "Even if counsel did not consult [Petitioner] before entering into the stipulations, [Petitioner] has presented no example of how the decision affected the outcome of the trial, and he is not entitled to relief on this basis." *Schaffer v. State*, No. W2016-00115-CCA-R3-PC, 2017 WL 1205957, at *17 (Tenn. Crim. App. Mar. 31, 2017). Petitioner is not entitled to relief as to this issue.

## II. Failure to Request Ms. Wade's Ophthalmology Records

Next, Petitioner argues that trial counsel were ineffective for failing to request Ms. Wade's ophthalmology records from VUMC after she was referred there by the Maury Regional Medical Center Emergency Room because she was later still reporting eye pain

from the incident with Petitioner. As set forth above, concerning this claim, the post-conviction court found:

> [Lead] [] counsel stated he reviewed the supplemental discovery provided about three weeks before trial. Maury Regional Hospital dated March 15, 2018, according to counsel, noted seeing victim for eye pain and [she] was referred to [VUMC]. Though counsel did not review the [VUMC] records the same was referenced in the Center of Hope records indicating that nothing was found at [VUMC]. Even if this information was before the jury, it would not have had a reasonable probability of undermining the outcome since there was other evidence in which to conclude Ms. Wade had suffered serious bodily injury.

Again, the record does not preponderate against the post-conviction court's findings. Lead counsel was aware that Ms. Wade was referred to VUMC for an ophthalmology appointment, and he did not attempt to obtain those records because the Center of Hope records he had received in discovery indicated that Ms. Wade said nothing was found during the VUMC appointment. Lead counsel testified that he felt that VUMC records would "leave us in the exact same position we were after the stipulation, because in the stipulation we said that Marshall Medical could not find any damage to her eye. I felt like we would be in the exact same place with other records saying there was no damage." He further asserted that they thought it would be "safer to keep it with one hospital saying we can't find any damage than saying there is two hospitals but she is also still complaining with pain[.]" Lead counsel was concerned that the VUMC records would bolster Ms. Wade's claim of having an eye injury from her altercation with Petitioner. Counsels' decision not to request the ophthalmology records was clearly a strategic one that was made with adequate information as a result of trial preparation and will not be second-guessed by this court. *Hellard*, 629 SW.2d at 12; *Tolliver*, 629 S.W.2d at 914. Trial counsels' performance concerning this issue was not deficient.

Furthermore, Petitioner has not shown that he was prejudiced by counsels' performance. As pointed out by the post-conviction court, on direct appeal this court found that there was evidence other than Ms. Wade's eye injury to support the jury's finding that she suffered serious bodily injury. This court found that the jury could also have inferred that Ms. Wade suffered protracted unconsciousness as a result of Petitioner's assault on her. *Porter*, 2020 WL 5914625, at *6. Additionally, Petitioner does not argue in his brief how he was prejudiced by trial counsels' failure to obtain the ophthalmology records. *See Strickland*, 466 U.S. at 687. Petitioner is not entitled to relief on this issue.

### III. *Failure to Adequately Advise Petitioner Concerning his Right to Testify*

Petitioner contends that trial counsel were ineffective for failing to advise him of the facts against him as "related to self-defense, including the advice with regards to

- 12 -

[Petitioner's] testimony and the self-defense argument." He further asserts that "absent from his testimony, all that was left to defend him against the allegations supporting serious bodily injury would have been in the medical records, which were stipulated away." Concerning this issue, the post-conviction court found:

> [Lead] [] counsel stated that Petitioner had impeachable offenses that were a concern. He was concerned about how much larger the Petitioner was than Ms. Wade. He further stated he felt Petitioner had more to lose than to gain by testifying and he told the Petitioner accordingly. However, it was up to Petitioner whether he testified. A *Momon* hearing was conducted which fully outlined Petitioner's rights in regard to testifying. Petitioner claims he chose not to testify based upon advice provided by counsel.

> [Lead] [] counsel advised his client appropriately. There is no evidence to demonstrate Petitioner's will was overborne in any[]way. Further, there is no evidence of what Petitioner would have testified to or whether it would have made any difference. This issue is without merit and he has failed to prove this factual allegation by clear and convincing evidence.

The record does not preponderate against the post-conviction court's findings. Lead counsel testified that he and co-counsel discussed with Petitioner his right to testify and gave the usual advice of telling Petitioner not to make a final decision until all of the State's proof had been presented. They reminded Petitioner of his prior federal drug conviction and thought it would be admitted for impeachment purposes if he testified at trial. Lead counsel specifically said he thought that anything Petitioner "would be able to add was outweighed by what we would lose by that conviction coming in." He further pointed out that Petitioner was much larger than Ms. Wade, and he did not want the jury to "get a good look at him" because this would have gone against the theory of self-defense. He noted that Petitioner was on the far side of the courtroom from the jury box during trial. Lead counsel testified that Petitioner understood the advice and was not forced into any decision about testifying and "begrudgingly" "made the decision himself[.]" The trial court also conducted a *Momon* hearing at the close of the State's proof concerning Petitioner's decision to testify.

Petitioner has not demonstrated that any of the advice given to him by trial counsel about testifying at trial was erroneous, and Petitioner made the decision himself not to testify. Moreover, Petitioner did not present proof at the post-conviction hearing as to what his testimony would have been at trial. "We cannot evaluate the impact of this absent testimony on the proof that was adduced at trial and, consequently, cannot conclude that there was a reasonable probability that [Petitioner's] testimony would have changed the outcome of the trial." *Claxton v. State*, No. W2021-01240-CCA-R3-PC, 2022 WL 2721331, at *4 (Tenn. Crim. App. July 14, 2022), *no perm. app. filed*. As previously pointed out, Ms. Wade admitted at trial that she struck Petitioner first as they were driving

- 13 -

down the road, and she continued scuffling with him and swinging at him after she moved into the seat behind him as they were driving down the road. Trial counsels' performance concerning this issue was not deficient nor has Petitioner shown that he was prejudiced by trial counsels' performance. Petitioner is not entitled to relief on this issue.

## IV.     Failure to Effectively Cross-Examine Ms. Wade

Petitioner asserts that trial counsel were ineffective for failing to cross-examine Ms. Wade at trial about inconsistencies between her statement to Deputy Neal and her testimony at the preliminary hearing and on direct examination at trial concerning her "protracted unconsciousness" after the altercation with Petitioner. Therefore, he contends that "[t]rial counsel fell short in outright impeaching [Ms. Wade]." Concerning this issue, the post-conviction court found:

> Petitioner claims the witnesses testified inconsistently and "even lied" and that trial counsel did not challenge them or object. Exhibit 5, page 28 and 29, demonstrates trial counsel challenged [Ms. Wade] on her testimony at trial versus the preliminary hearing regarding whether [Ms. Wade] was passed out in the roadway. At the post-conviction hearing there was not really any evidence produced for the court . . . to pass judgment on this issue. A reading of the trial transcript (exhibit 5) does not show anything glaring.
>
> It is a well-settled rule that newly discovered impeachment evidence will not constitute persuasive grounds for a new trial unless the impeachment evidence is so crucial to the issue of the defendant's guilt or innocence that the admission of newly discovered impeachment evidence will probably result in an acquittal. *State v. Bowers*, 77 S.W.3d 776 (Tenn. Crim. App. 2001).

(emphasis in original). The post-conviction court further found that Ms. Wade was cross-examined about the inconsistencies between her trial testimony and her preliminary hearing testimony, and she "admitted that she may have made an inconsistent statement regarding blacking out and seeing the Petitioner walking away. There was no showing of inconsistencies regarding her reports to medical providers and her trial testimony. [Petitioner] has failed to prove this fact by clear and convincing evidence."

The record does not preponderate against the post-conviction court's findings. A trial counsel's decision concerning the manner and subject manner of cross-examination, "is a strategic[] or tactical choice, if informed and based upon adequate preparation." *Pierce v. State*, No. M2005-02565-CCA-R3-PC, 2007 WL 189392, at *7 (Tenn. Crim. App. Jan. 23, 2007) (citing *Hellard*, 629 S.W.2d at 9); *see also Keene v. State*, No. E2022-01410-CCA-R3-PC, 2023 WL 5978223, at *5 (Tenn. Crim. App. Sept. 14, 2023), *perm app. denied* (Feb. 13,2024); *Brown v. State*, No. W2021-01331-CCA-R3-PC, 2022 WL

- 14 -

16919956, at *8 (Tenn. Crim. App. Nov. 14, 2022), *perm. app. denied* (Tenn. Mar. 9, 2023). Additionally, "strategic decisions during cross-examination are judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time." *Reeves v. State*, No. M2004-02642-CCA-R3-PC, 2006 WL 360380, at *10 (Tenn. Crim. App. Feb. 16, 2006). In this case, trial counsel made a strategic decision to use the transcript of Ms. Wade's testimony from the preliminary hearing to impeach her credibility at trial and dispute the State's proof that she suffered serious bodily injury as a result of the assault by Petitioner. On direct examination, Ms. Wade testified that Petitioner kicked her in the head, immediately knocking her unconscious. However, at the preliminary hearing, she said that she saw him walking away after he assaulted her, and then she lost consciousness. Lead counsel pointed out this inconsistency to the jury and cross-examined Ms. Wade about it. He further questioned Ms. Wade about reporting higher levels of pain for injuries from a subsequent car accident and a toothache than she reported for the assault in this case.

Lead counsel was aware that Deputy Neal's report reflected that Ms. Wade said Petitioner pushed her out of the vehicle into the ditch and drove away, and then she started walking. She did not mention unconsciousness. Lead counsel noted that there was also a dispute at trial as to whether Ms. Wade landed in the ditch or was lying in the middle of the road. Lead counsel made a strategic decision to use this report during Deputy Neal's cross-examination to attack Ms. Wade's credibility because lead counsel did not want to cross-examine Ms. Wade with the report and give her the opportunity to explain the discrepancy. Lead counsel clearly made an informed strategic decision concerning his cross-examination of Ms. Wade that was based upon adequate preparation and will not be second-guessed by this court. *Pierce*, 2007 WL 189392, at *7; *Keene*, 2023 WL 5978223, at *5; *Brown*, 2022 WL 16919956, at *8. Petitioner has not shown that trial counsel rendered deficient performance concerning this claim.

Furthermore, Petitioner has not shown any prejudice from lead counsel's cross-examination of Ms. Wade. This court has held:

> When evaluating the performance of trial counsel on cross-examination, the petitioner must show "what additional beneficial evidence could have been elicited" through his or her preferred cross-examination. *See Ortiz v. State*, No. M2020-01642-CCA-R3-PC, 2021 WL 5080514, at *4 (Tenn. Crim. App. Nov. 2, 2021), *perm app. denied* (Tenn. Jan. 14, 2022). In addition, the petitioner must also present that witness at the post-conviction evidentiary hearing to show how the witness would have responded to trial counsel's questioning. *See Britt v. State*, No. W2016-00928-CCA-R3-PC, 2017 WL 1508186, [at] *4, *7 (Tenn. Crim. App. Apr. 25, 2017) ("[T]he Petitioner did not present Ms. Tackett's testimony at the post-conviction hearing to show how she would have responded had trial counsel asked about her inability to see the fight . . . . The Petitioner has failed to prove . . . that there is any

- 15 -

> reasonable probability of another outcome had trial counsel cross-examined Ms. Tackett differently.").

*Brown*, 2022 WL 16919956, at *8. In this case, Petitioner has not suggested what questions should have been asked of Ms. Wade during cross-examination, and he did not call her as a witness at the post-conviction hearing. Therefore, we cannot speculate as to how she would have responded to any questions that Petitioner thinks should have been asked of her at trial.[4] *Id*.; *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Petitioner is not entitled to relief on this issue.

### V. Whether Petitioner was Deprived of the Right to a Fair Trial

Finally, Petitioner argues that trial counsels' representation was deficient to the extent that it deprived him of the right to a fair trial. More specifically, he contends that the facts of this case fail to meet the statutory definition of serious bodily injury to support his conviction for aggravated assault and "that had [t]rial [c]ounsel been effective, the [S]tate would not have been able to so prove." Petitioner further asserts the proof supporting his reckless endangerment charge "involved testimony about unconsciousness and the location as to where [Ms. Wade] was left at the point [Petitioner] drove away." He contends that "both issues" are "in conflict from the proof, neither of those topics were well developed in cross-examination. Both of those issues are contradicted by statements in Exhibits 1, 2, 4, and 5. The [trial] transcript contains no proper impeachment."

Although Petitioner labels this argument as an ineffective assistance of counsel issue, he essentially appears to be challenging the sufficiency of the evidence by arguing that the proof presented at trial was insufficient to show that Ms. Wade suffered serious bodily injury in support of his conviction for aggravated assault and that there was a conflict in the proof as to whether she was left unconscious in the middle of the road by Petitioner to support his conviction for reckless endangerment. This court has already found on direct appeal that the evidence was sufficient to support both convictions. *Porter*, 2020 WL 5914625, at *1. Therefore, Petitioner is not entitled to relief on this issue. *Wilson v. State*, No. W2018-01588-CCA-R3-PC, 2020 WL 7658417, at *11 (Tenn. Crim. App. Dec. 22, 2020) (holding that "although the [p]etitioner labels this as an election issue, he appears in essence to be challenging the sufficiency of the evidence by arguing that the victim's testimony was insufficient to sustain a conviction for the elected offense").

---

[4] In his brief, Petitioner states that the "whereabouts of the [v]ictim were unknown as of the hearing, and her testimony was not otherwise available." There is no further explanation as to her absence at the post-conviction hearing.

**Conclusion**

For the foregoing reasons, we affirm the judgment of the post-conviction court.

_____
JILL BARTEE AYERS, JUDGE